**In re WESTERN PAC. R. CO.**

**No. 26591–S.**

District Court, N. D. California, S. D.

Aug. 15, 1940.

Pierce & Greer, of New York City, and C. W. Dooling, of San Francisco, Cal., for debtor.

Cravath, de Gersdorff, Swaine & Wood, of New York City, and Morrison, Hohfeld, Foerster, Shuman & Clark, of San Francisco, Cal., for Institutional Bondholders Committee.

Pillsbury, Madison & Sutro, of San Francisco, Cal., and Davies, Auerbach, Cornell & Hardy, of New York City, for Irving Trust Co., substituted trustee under general and refunding mortgage.

Whitman, Ransom, Coulson & Goetz, of New York City, and Garret W. McEnerney and Andrew F. Burke, both of San Francisco, Cal., for A. C. James & Co.

C. M. Clay and Florence de Hass Dembitz, both of Washington, D. C., and Brobeck, Phleger & Harrison, of San Francisco, Cal., for Reconstruction Finance Corporation.

Edward G. Buckland, of New Haven, Conn., for Railroad Credit Corporation.

Sloss, Turner & Finney, of San Francisco, Cal., for Western Pac. R. Co.

Leroy R. Goodrich, of Oakland, Cal., for Western Realty Co.

Chickering & Gregory, of San Francisco, Cal., and Milbank, Tweed & Hope, of New York City, for Crocker First Nat. Bank of San Francisco and Samuel Armstrong, trustee of first mortgage.

Pillsbury, Madison & Sutro, of San Francisco, Cal., and Milbank, Tweed & Hope, of New York City, for Chase Nat. Bank of City of New York.

ST. SURE, District Judge.

This is a proceeding under section 77 of the Bankruptcy Act[1] for the reorganization of the Western Pacific Railroad Company.

On August 2, 1935, the Debtor filed a petition stating that it was unable to meet its debts as they matured and that it desired to effect a plan of reorganization. The court approved the petition and authorized the Debtor, pending further order of the court, to continue in possession of and operate and maintain the railroad and its properties, and to manage and conduct its business as a railroad company. Trustees were appointed and ratified by the Interstate Commerce Commission. "The judicial functions of the bankruptcy court and the administrative functions of the Commission work cooperatively in reorganizations."[2]

---

[1] 11 U.S.C.A. § 205.

[2] Warren et al. v. Palmer et al., 60 S. Ct. 865, 867, 84 L.Ed. ——, decided by the Supreme Court on April 29, 1940; Palmer v. Massachusetts, 308 U.S. 79, 87, note 14, 60 S.Ct. 34, 84 L.Ed. 93.

Thereafter, all necessary legal steps required by the Act were taken, and on February 8, 1936, Debtor filed a plan of reorganization with the Commission. In addition, plans were filed on behalf of the Institutional Bondholders Committee, and on behalf of A. C. James Co. On August 1, 1937, the Bureau of Finance of the Interstate Commerce Commission issued a proposed report containing a recommended plan of reorganization to which exceptions were filed by the Debtor, the Institutional Bondholders Committee, the First Mortgage Trustees, the Refunding Mortgage Trustee, A. C. James Co., Reconstruction Finance Corporation, and the Railroad Credit Corporation. Hearings were had before the Commission, and on October 10, 1938, the Commission issued its original report and order approving a plan of reorganization.[3]

On December 9, 1938, the Debtor, the Institutional Bondholders Committee, the Refunding Mortgage Trustee, A. C. James Co., Reconstruction Finance Corporation and the Railroad Credit Corporation filed their separate petitions with the Commission for rehearing and modification of the original report and order and the plan of reorganization approved therein. Answers to certain of said petitions were filed by the First Mortgage Trustees and the Railroad Credit Corporation. Proposals for modification of the Commission's plan were attached to or contained in such petitions. A rehearing on the basis of these petitions was granted by order of the Commission entered December 30, 1938.

On June 21, 1939, the Commission issued its "Report and Order on Further Consideration"[4] (hereinafter referred to as the supplemental report and order) approving a modified plan of reorganization (hereinabove and hereinafter referred to as the Commission plan). By its report and order of June 21, 1939, the Commission modified the original report and revoked and rescinded the original order.

On or about August 1, 1939, and prior to the certifying to the court of the Commission plan and the record before the Commission, the Debtor filed a petition for rehearing and modification of the Commission plan. Answers thereto were filed by certain parties. Said petition was denied by the Commission by a report and order entered September 19, 1939.

Pursuant to the requirements of subsection d of section 77, the Commission on or about September 28, 1939, certified to the court the Commission plan together with a transcript of the proceedings before it and a copy of the supplemental report and order approving the plan, which were filed in this proceeding on October 3, 5, and 6, 1939.

On November 8, 1939, the court, pursuant to the provisions of subsection e and of clause 8 of subsection c of section 77, entered its order fixing the time within which objections to the Commission plan and claims for equitable treatment might be filed herein, fixing the time within which applications might be filed for expenses and fees incident to the reorganization, and fixing December 8, 1939, as the date for the filing of such objections and claims for equitable treatment and petitions for an allowance for compensation for services rendered or for expenses (including reasonable attorneys' fees) incurred, in connection with the proceeding and plan of reorganization up to and including October 31, 1939, and providing for the giving of due notice by the Debtor's trustees to creditors and stockholders, or their representatives, and all other parties in interest.

Petitions for intervention were granted to several parties in interest, and pursuant to the order of November 8, 1939, objections to the Commission plan and claims for equitable treatment were filed by or on behalf of the Debtor, the Institutional Bondholders Committee, the Refunding Mortgage Trustee, A. C. James Co., Reconstruction Finance Corporation, the Railroad Credit Corporation, the Western Pacific Railroad Corporation, and the Western Realty Company.

On December 18, 1939, the court, pursuant to Rule 16 of Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, held a pre-trial conference of the attorneys for the parties in interest. At the conference the parties agreed upon substantially all the facts upon which depend the decision of the issues raised by the objections and claims for equitable treatment, and accordingly, on December 20, 1939, filed a "Stipulation as to Facts Not in Dispute." The parties failed to agree upon a stipulation as to the issues. On December 21, 1939, the court made its

---

[3] 230 I.C.C. at page 61.

[4] 233 I.C.C. 409.

order fixing January 22, 1940, as the time for hearing objections to the plan of reorganization. On December 29, 1939, the court made its order reciting the action taken at the pre-trial conference and ordered "that the issues for trial of said hearing on January 22, 1940, shall be the issues raised and presented by said objections to said plan of reorganization and by said claims for equitable treatment."

The Debtor owns or operates 1,207.51 miles of standard gauge railroad. A main line extends eastward 924.17 miles from Oakland, California, to Salt Lake City, Utah. The Northern California Extension extends northward 111.81 miles from Keddie to Bieber, California, with operating rights from Bieber to Hambone, California—46.38 miles—over the Great Northern Railway. In addition to said main line mileage and the Northern California Extension, the Debtor has approximately 131.66 miles of branch line mileage springing from the Oakland-Salt Lake City line.

Reference is hereby made to the original report and order of the Commission[5] for more detailed descriptions of the property owned and controlled by the Debtor, its corporate and financial history, financial structure, traffic and revenue, earnings available for charges, classes of creditors and stockholders, and the proposed plans of reorganization. Such reference is made for the purpose of shortening this opinion and because the data contained in the Commission's original report is in the main correct. However, it is to be understood, unless otherwise stated herein, that facts and figures stated in this opinion, and upon which it is based, are from the "Stipulation as to Facts Not in Dispute," the record certified to the court by the Commission, and additional proof offered in open court.

The essential, undisputed facts with respect to the Commission plan necessary for the court's determination of the issues are set forth in the following summarization, taken from the brief of the Institutional Bondholders Committee, because concisely stated. The Commission plan, which by its terms is to be made effective as of January 1, 1939, provides the following capital structure for the reorganized company:

| Title of Issue | Presently Issued | Interest, Dividends or Other Income Charges |
|---|---|---|
| Undisturbed Existing Equipment Trusts, Baldwin Lease and Pullman Contract | $ 2,750,050 | $ 94,202 |
| First Mortgage 4% Bonds, Series A, due January 1, 1974 | 10,000,000 | 400,000 |
| Total Annual Fixed Charges | | $ 494,202 |
| Mandatory Capital Fund | | 500,000 |
| Income Mortgage 4½% Bonds, Series A, due January 1, 2014. Interest cumulative to 13½%, otherwise noncumulative | 21,219,075 | 954,858 |
| Total Funded Debt | $33,969,125 | |
| Total annual charges (fixed and contingent) and Capital Fund | | $1,949,060 |
| Income Mortgage Sinking Fund | | 106,095 |
| Participating 5% Preferred Stock ($100 par value). Dividends non-cumulative, participating share for share with Common Stock in dividends declared in any year after dividends have been declared on Common Stock at rate of $3 per share | 31,850,297 | 1,592,515 |
| Total securities with par value | $65,819,422 | |
| Total annual charges, Capital Fund, Sinking Fund and Preferred dividend requirements | | $3,647,670 |
| Common Stock (without par value) | 319,441 shs. | |

[5] 230 I.C.C. 61 et seq.

The existing claims against, and interests in, the Debtor dealt with by the Commission plan, together with interest accrued from the last interest payment date to the effective date of the plan, January 1, 1939, computed at the contract rates, are as follows. Brevity demands the use of initials for the names of claimants in the following tables, foot-notes, and context, as RFC for Reconstruction Finance Corporation, ACJ for A. C. James Co., W P Corp for Western Pacific Railroad Corporation, RCC for the Railroad Credit Corporation:

| Claim or Interest | Principal of claim or interest | Accrued interest at contract rate to effective date of plan | Total claim, including interest at contract rate to effective date of plan |
|---|---|---|---|
| Trustee's Certificates | $ 10,000,000.00 | $ .......... | $ 10,000,000.00 |
| Undisturbed existing equipment obligations | 2,750,050.00 | 94,202.00 | 2,844,252.00 |
| First Mortgage 5% Bonds | 49,290,100.00 | 13,143,776.66 | 62,433,876.66 |
| RFC Collateral Notes (a) | 2,963,000.00 | 899,869.98 | 3,862,869.98 |
| RFC Collateral Notes (b) | 2,445,609.88 | 145,314.23 | 2,590,924.11 |
| ACJ Collateral Notes (c) | 4,999,800.00 | 1,249,950.00 | 6,249,750.00 |
| Total secured debt | $ 72,448,559.88 | $15,533,112.87 | $ 87,981,672.75 |
| W P Corp advances on open account | 5,768,791.00 | 1,980,429.00 | 7,749,220.00 |
| The Western Realty Company (d) advances on open account | 50,000.00 | 11,667.00 | 61,667.00 |
| Total debt | $ 78,267,350.88 | $17,525,208.87 | $ 95,792,559.75 |
| W P Corp, owner of the entire outstanding 283,000 shares of Preferred Stock, par value $100 per share | 28,300,000.00 | ............ | 28,300,000.00 |
| W P Corp, owner of the entire outstanding 475,000 shares of Common Stock, par value $100 per share | 47,500,000.00 | ............ | 47,500,000.00 |
| Totals | $154,067,350.88 | $17,525,208.87 | $171,592,559.75 |

(a) The notes held by RFC are secured by the pledge of $8,750,000, principal amount, of refunding mortgage bonds, series A, and $2,000,000, principal amount of refunding mortgage bonds, series B; by the pledge of voting trust certificates for 150,000 shares of common stock of Denver & Rio Grande Western Railroad Company, pledged with RFC by W P Corp; and by a second lien upon $2,000,000 of refunding mortgage bonds, series A, now pledged with RCC.·

(b) The notes held by RCC are secured by the pledge of $2,000,000, principal amount, of refunding mortgage bonds, series A, and $2,000,000, principal amount, of refunding mortgage bonds, series B of which $2,000,000, principal amount, of series A bonds were repledged with it by ACJ. In addition, such notes are secured by a second lien on all the securities pledged with RFC; by a first lien on the Debtor's distributive share in the fund established by the marshalling and distributing plan, 1931; by a first lien on the advances from W P Corp to the Debtor in the sum of $5,494,722; by a lien on the advances made by W P Corp to Standard Realty and Development Company in the sum of $120,000; and by a lien on the advances made by W P Corp to Sacramento Northern Railway in the sum of $856,260, subject, as to the Sacramento Northern advances, to any and all rights and claims in respect thereof, if any, of the trustees or the holders of first mortgage bonds.

(c) The notes held by ACJ are secured by the pledge of $6,249,500, principal amount, of refunding mortgage bonds, series A, of which $2,000,000, principal amount, are

subject to the prior lien of RCC as pledgee, ACJ having repledged said $2,000,000 of such bonds with RCC as additional collateral security for the Debtor's note to RCC.

(d) While Western Realty Company is a separate corporate entity, which has separately intervened and appeared in this proceeding, all of its stock is held by W P Corp. Its rights as a creditor of the Debtor are identical with those of W P Corp as a creditor of the Debtor. Accordingly, for the sake of simplicity, it and its rights are hereinafter included in any reference to W P Corp or W P Corp's rights as creditor of the Debtor unless the context otherwise requires.

The Commission plan provides for the distribution of the securities of the reorganized company among the existing securityholders of the Debtor as follows:

| Existing Securities of Debtor | New First Mortgage 4% Bonds, Series A | New Income Mortgage 4½% Bonds, Series A | New 5% Preferred Stock, Series A, ($100 par) | New Common Stock (No Par) |
|---|---|---|---|---|
| 5% First Mortgage Bonds....... | | $19,716,040 | $29,574,060 | 230,593 shs. |
| RFC | | | | |
| New Money (In exchange for Trustee's Certificates all now held by RFC.).............. | $10,000,000 | | | |
| Collateral Notes.............. | | 1,185,200 | 1,777,800 | 15,788 shs. |
| RCC Collateral Notes............ | | 154,111 | 241,681 | 35,425 shs. |
| ACJ Collateral Notes............ | | 163,724 | 256,756 | 37,635 shs. |
| Totals ................ | $10,000,000 | $21,219,075 | $31,850,297 | 319,441 shs. |

The first mortgage bonds are allotted new income mortgage bonds for 40% of the principal of their claim, new preferred stock for 60% of the principal of their claim and new common stock for 100% of their accrued interest, such common stock having been allotted at the price $57 per share.

RFC is allotted treatment in respect of its collateral note pari passu with the treatment allotted the first mortgage bonds in consideration of its exchanging its $10,000,000 trustees certificates for $10,000,000 new first mortgage bonds or purchasing said bonds at par to retire said trustees certificates.

RCC and ACJ are allotted new securities on the following basis: From the new securities, which the Commission finds are properly issuable in respect of the refunding mortgage bonds held as collateral for the RFC, RCC, and ACJ notes, are deducted that proportion of each class which the principal amount of refunding mortgage bonds held by RFC as collateral bears to the total amount of pledged refunding mortgage bonds. The balance of such new securities is then divided between RCC and ACJ in proportion to the principal amounts of refunding mortgage bonds held by them respectively as collateral. The result is the al-lotment of common stock to RCC on its claim at the price of $62 per share.

The unsecured claims of the Western Pacific Railroad Corporation and the Western Realty Company, and other unsecured claims not entitled to priority over existing mortgage, are found by the Commission to be without value and not entitled to participate in the distribution of cash or securities of the reorganized company.

The capital stock of the debtor (all held by W P Corp) is found by the Commission to be without equity or value and the stockholders not to be entitled to participate in the plan.

The issues raised by the objections relate, first, to the amount and character of the capitalization, second, to the distribution of the new securities among the holders, and, third, to the execution of the Commission plan.

It is objected by A. C. James Co., the Western Pacific Railroad Corporation, the Western Realty Company, the Debtor, and the Railroad Credit Corporation, that the Commission plan is unfair and inequitable and fails to afford due recognition to the rights of each class of creditors and stockholders in relation to the value of the as-

sets of the Debtor; that it is discriminatory and does not comply with the law of the land; and that it is confiscatory of private property rights, in violation of the Fifth Amendment to the Constitution. While it is not asserted that section 77 is unconstitutional, objectors argue that it "should not be interpreted as authorizing the confiscation and destruction of private property," and that as "the findings and conclusions of the Commission result in such confiscation and destruction [they] are in violation of the Constitution and the law of the land." These questions go to the heart of the matter.

The powers and functions of the Commission and the court are found in subsections d and e of section 77.[6] Subsection f incorporates the provisions of section 20a[7] of the Interstate Commerce Act relative to issuance of securities. Subsection d provides that the Commission "shall approve a plan * * * that will in its opinion meet with the requirements of subsections (b) and (e) of this section, *and will*

*be compatible with the public interest.*" [Emphasis supplied.] Similar terms are to be found in paragraph 2 of section 20a and paragraph 3 of section 5 of the Interstate Commerce Act, 49 U.S.C.A. § 5(3). In New York Central Securities Co. v. United States, 287 U.S. 12, 24, 53 S.Ct. 45, 77 L. Ed. 138, it was held that such a delegation of authority to the Commission was not invalid because the stated criterion is uncertain.

In its original report and order the Commission said: "It will be observed that so far as the capitalization of a reorganized company is concerned, section 77 contains no limitations other than that the fixed charges of the company shall be adequately covered by the probable earnings available therefor, and that the plan as a whole shall be compatible with the public interest. The public interest is not defined, but it would seem obvious that to be compatible with the public interest the plan must provide a capital structure for the reorganized company which will give it a reasonable

---

[6] By the provisions of section 77 sub. b of the Bankruptcy Act, as amended, a plan of reorganization shall include provisions modifying or altering the rights of creditors generally, or any class of them, secured or unsecured, either through the issue of new securities of any character or otherwise; shall provide for fixed charges (including fixed interest on funded debt, interest on unfunded debt, amortization of discount on funded debt, and rent for leased railroads) in such an amount that, after due consideration of the probable prospective earnings of the property in the light of its earning experience and all other relevant facts, there shall be adequate coverage of such fixed charges by the probable earnings available for the payment thereof; and shall provide adequate means for the execution of the plan. Subsection e of section 77 provides that the judge shall approve the plan certified to the court by us, if satisfied, after hearing, and without hearing if no objections are filed, that the plan complies with the provisions of subsection b, is fair and equitable, affords due recognition to the rights of each class of creditors and stockholders, does not discriminate unfairly in favor of any class of creditors or stockholders, and will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders; that the approximate amounts to be paid by the debtor, or by any corporation or corpo-

rations acquiring the debtor's assets, for expenses and fees incident to the reorganization, have been fully disclosed so far as they can be ascertained at the date of the hearing, are reasonable, are within such maximum limits as are fixed by us, and are within such maximum limits as to be subject to the approval of the judge; that the plan provides for the payment of all costs of administration and all other allowances made or to be made by the judge, except that allowances for the actual and reasonable expenses, including reasonable attorney's fees, incurred in connection with the proceedings and plan by parties in interest and by reorganization managers and committees or other representatives of creditors and stockholders, and the actual and reasonable expenses incurred in connection with the proceedings and plan and reasonable compensation for services in connection therewith by trustees under indentures, depositaries, and such assistants as we, with the approval of the judge, may especially employ, may be paid in securities provided for in the plan if those entitled thereto will accept such payment. By the provisions of subsection d of section 77, the plan approved by us must meet with these requirements of subsections b and e and be compatible with the public interest, but such plan may be different from any which has been proposed. Original report and order of Commission, 230 I.C.C. at pages 86 and 87.

[7] 49 U.S.C.A. § 20a.

opportunity to function efficiently and continuously as a going concern. This requires that the capitalization shall not exceed a conservative appraisal of the assets to be taken over by the reorganized company, and that proposed charges, whether fixed or contingent, shall be within its probable earning power."[8]

The construction given by the Commission to the term "public interest" is neither new nor arbitrary, but has been consistently followed before and since the enactment of section 20a of the Interstate Commerce Act.

The last paragraph of subsection e of section 77 provides: "The value of any property used in railroad operation shall be determined on a basis which will give due consideration to the earning power of the property, past, present, and prospective, and all other relevant facts. In determining such value only such effect shall be given to the present cost of reproduction new and less depreciation and original cost of the property, and the actual investment therein, as may be required under the law of the land, in light of its earning power and all other relevant facts.". This paragraph was incorporated in the statute as part of the 1935 amendments.

Mr. Leslie Craven, attorney for the Railroad Security Owners Association, who was counsel for Honorable Joseph B. Eastman when he was Federal Coordinator of Transportation, testified at the hearing before the Special Sub-Committee on Bankruptcy and Reorganization of the Committee on the Judiciary, House of Representatives in 1939,[9] concerning this legislation. The particular amendment was drawn by Mr. Craven and sponsored by him and Mr. Eastman. Mr. Craven says that "the valuation provisions in the existing law were so drawn that whoever tried to upset the valuation of the Commission would not be able to do it. The language is left in generalities. * * * As the Act stands, the value of any property used in railroad operation shall be determined on a basis which will give due consideration to the earning power of the property, past, present and prospective, and all other relative facts."[10]

---

[8] 230 I.C.C. 61, 87.

[9] H.Rep., 76 Congress, 1st Session on S.1869, Serial No. 11, part 1, 1939, Railroad Reorganization, p. 464.

[10] H.Rep. 76 Congress, supra, pp. 485, 486.

In discussing the quoted provision (subsection e of section 77), Mr. Craven said in an article in the Harvard Law Review:

"Amendments simplifying and clarifying the determination of the valuation were required, because the provisions of the original Act [the 1933 Act] enabling an elimination of the consent of claimants demonstrated to have no interest by a valuation, or for the value of whose interest a cash payment was provided, were regarded as unworkable because of the great task of valuing property of such magnitude and because of uncertainty as to the results, due to doubt as to the legal principles governing such a valuation. The assignment of the determination to the courts, as provided in the original Act, was inappropriate. The courts are ordinarily inexperienced with this technical problem, while the Commission has had extended experience since 1913 in its administration of the LaFollette Valuation Act. This experience has indicated great difficulty in making such determinations, if the kind of value to be determined in a reorganization case is the same as a value for rate-making purposes under the principles of Smyth v. Ames * * *. The obstructive possibilities open to the equity and creditor interests, through the probability of prolonged hearings and litigation involving these complicated questions, were evident from the Commission's valuation cases. That the equity interests were well aware of the strategic value to them of the original provisions of section 77 was evidenced by the insistence with which they fought any simplification of the process. They asserted that value in a reorganization case is the same as in a rate case.

* * *

"The purpose of these provisions [the provisions contained in the last paragraph of subsection e of section 77] is to lodge the determination of the value in the Commission in the first instance, and to incline the determination away from the doctrine of Smyth v. Ames, under which the value is fixed on the basis of a consideration of the original and reproduction cost of the property and the investment therein. The actual value of the property cannot be determined, nor is it ordinarily evidenced by the investment in the property or its present cost of construction. The railroads are competitive properties. The value of their operative property, for purposes of reor-

The idea of a sound financial structure in railroad reorganizations is not an innovation. In Missouri-Kansas-Texas Reorganization, 1922, 76 I.C.C. 84, 108, in administering the provisions of the Transportation Act of 1920, 41 Stat. 456, Commissioner Eastman said: "In the past such reorganizations have largely been a matter of bargain and trade between groups of security holders without adequate consideration of the paramount public interest, so that the results have often been consistent neither with the public interest nor even with sound business principles, and recurring receiverships have been far from uncommon. * * * The public interest, I think, clearly demands that a reorganized property should begin its new career with a capitalization which will enable it, if that be possible, not only to keep clear of bankruptcy but also to attract the capital necessary for future development." And in the Denver & Rio Grande Western Reorganization, 1924, 90 I.C.C. 141, 157, 158, Commissioner Eastman said: "It seems to me that we should at least insist, in the case of any such reorganization, that the new company shall start life with a reasonably sound financial structure. If this were our policy, reorganization managers would stand on firmer ground in dealing with the holders of the securities of insolvent companies than they now find under their feet." In Chicago, Milwaukee & St. Paul Investigation, 1928, 131 I.C.C. 615, a reorganization matter, the Commission again expressed dissatisfaction with the state of the law which it was said presented a situation fundamentally unsatisfactory and required reform. The subject has been repeatedly discussed in Congress,[11] and such discussions undoubtedly induced the enactment of the amendments of 1935 for the purpose of clarifying the then existing law. Having in mind the judicial history of railroad reorganizations, and the provisions of the Transportation and Interstate Commerce Acts, Congress in its wisdom, by the amendments of 1935, delegated to the Commission, where it logically belongs and can best be performed, authority to determine for any purpose the value of the property of the railroad seeking reorganization.

It cannot be gainsaid that the Commission knows all about the Debtor, its property, its history, financial and otherwise, its traffic and revenue, and its financial structure. No official body in the country is better qualified, by reason of experience, ability and specialized knowledge than is the Commission to find the ultimate facts as to the Debtor in relation to any of the matters mentioned. For a period of four years, since August, 1935, the Debtor has been before the Commission in an intensive investigation of its affairs in the

---

ganization, must necessarily be what, for better terms, we may call the actual value or the economic worth of the property, as determined primarily by its present and prospective earning capacity. The actual value of the property depends upon the demand for its service and its ability to meet the demand economically. The provisions of the amended statute, therefore, make, clear that emphasis shall be put on a consideration of earning power, past, present and prospective." Leslie Craven and Warner Fuller, "The 1935 Amendments of the Railroad Bankruptcy Law," 49 Harv.L.Rev. 1254, 1272, 1274.

[11] As reflecting these discussions I quote the following from report No. 454 of the Senate Committee on Interstate Commerce, issued on May 18, 1939:

"For the purpose of creating a sound financial structure, it is immaterial what may at one time have been invested in the road, what it originally cost, what it would cost to reproduce, or what its value may be claimed to be as an abstraction. The controlling question is: What can the property earn to support its capital structure?

"It would be tantamount to fraud to create worthless securities in reorganizations, securities that cannot be reasonably expected to be supported by earnings. That would be simply creating tokens for stock-market speculation. . *  *  *

"Reorganizations cannot succeed if they are based on claimed values that have long since disappeared in a realistic sense and on business that has long since been lost to the railroads never to return. A reorganization based on a sound judgment of earning power destroys no values and creates no losses. It merely realistically recognizes the facts, including the unpleasant but nevertheless inescapable fact that values based on original cost or even reproduction cost simply do not exist without earning power to support them." H.Rep., 76 Congress, 1st Session, serial 11, part 1, 1939, Hearing on Railroad Reorganization, p. 346.

present proceeding.[12] In its original report and order the Commission says: "The present reorganization of the debtor is the second since it began complete operations in 1911. A review of its financial history shows that due to an inherent lack of earning power its past operations have resulted in financial failure, and that the investment in its property has not been justified by its earnings. In Denver & R. G. Investigation, 113 I.C.C. 75, we pointed out that economically the original construction of the debtor was an ill-advised undertaking. If this reorganization is to be successful, the capital structure of the reorganized company must be realistically related to its actual earning power, and consideration given to the investment in its property only to the extent that such investment is justified by the probable earnings reasonably foreseeable for the future." 230 I.C.C. at pages 61, 87.

The capital structure, existing claims and distribution of securities of the reorganized

---

[12] In its original report, 230 I.C.C. 61, the Commission said:

"Under section 19a of the Interstate Commerce Act [49 U.S.C.A. § 19a], this Commission, by division 1, in Western Pacific Ry. Co., 29 Val.Rep. 239, reported the value for rate-making purposes of the property owned by the debtor to be $63,321,000 as of June 30, 1914, excluding working capital. In other proceedings, we reported the value for rate-making purposes of the properties of the debtor's wholly owned subsidiaries, Sacramento Northern Railway, Tidewater Southern Railway Company, and Deep Creek Railroad Company, in the total amount of $18,123,283, as of their respective valuation dates. If there were added to the above amounts the net costs of additions and retirements between valuation dates and December 31, 1935, the total would be $139,600,455." Original Report, 230 I.C.C. at page 76.

* * *

"If this reorganization is to be successful, the capital structure of the reorganized company must be realistically related to its actual earning power, and consideration given to the investment in its property only to the extent that such investment is justified by the probable earnings reasonably foreseeable for the future." Original Report, 230 I.C.C. at page 87.

* * *

"It is true that, considered alone, the data pertaining to the rate-making value of the debtor's property, and its investment, would support capitalizations approximating those proposed in the three plans. We have hereinbefore stated, however, the reasons why, in our opinion, those factors cannot be of controlling importance in a determination of the capital structure for the reorganized company. Considering all relevant data of record, we find that the approved plan should provide for the immediate issue by the reorganized company of not to exceed 295,740.3 shares of preferred stock of the par value of $100 per share, and not more than 313,703 shares of no-par-value common stock." Original Report, 230 I.C.C. at page 94.

* * *

"Under the provisions of section 77, stockholders are not entitled to participate in the plan if we find, and the judge affirms the finding, that at the time of the finding the equity of such stockholders has no value. Section 77 also contains a similar provision with respect to creditors whose claims have been found to have no value. We have hereinbefore found that, considering the past, present, and probable future earnings of the debtor, its investment, the data of record pertaining to its rate-making value, and all other relevant data of record, we cannot approve the issue of new securities in a greater amount than that hereinbefore approved. On the same basis and for the same reasons we find, therefore, that there is no equity over and above the securities hereinbefore approved; and that the equity of the existing stock has no value, and hence holders of such stock are not entitled to participate in the plan." Original Report, 230 I.C.C. at pages 100, 101.

The following extract is from the commission's supplemental report, 233 I.C.C. 409, 413: "In our prior report we stated that the entire capital structure of the reorganized company must be realistically related to its actual earning power and that in determining such capital structure consideration should be given to the investment in the property only to the extent that such investment should be justified by the probable earnings reasonably foreseeable for the future if the reorganization was to be successful. With these considerations in mind, and for the reasons there set forth, and upon consideration of the investment of the debtor in its property, the probable rate-making value thereof, and its traffic and earnings, we conclude that we cannot approve the total capital structure under the Credit Corporation's proposed modification."

company are contained in the summarization of the Commission plan hereinbefore set forth. The reported and adjusted earnings of the Debtor appearing in the stipulation of facts are as follows:

| Year | Earnings Available for Interest | |
| --- | --- | --- |
| | Reported | As Adjusted |
| 1922 ...... | $2,306,124 | $2,404,890 |
| 1923 ...... | 3,313,976 | 4,412,234 |
| 1924 ...... | 3,144,124 | 3,241,823 |
| 1925 ...... | 4,454,352 | 4,557,798 |
| 1926 ...... | 4,759,282 | 4,868,390 |
| 1927 ...... | 2,674,494 | 3,470,861 |
| 1928 ...... | 2,964,371 | 4,376,972 |
| 1929 ...... | 2,529,846 | 3,718,436 |
| 1930 ...... | 1,552,487 | 2,381,529 |
| 1931 ...... | 186,708(D) | 220,494(D) |
| 1932 ...... | 252,706 | 283,912 |
| 1933 ...... | 674,007 | 474,365 |
| 1934 ...... | 1,084,244 | 1,396,353 |
| 1935 ...... | 805,589 | 1,377,026 |
| 1936 ...... | 181,102 | 1,901,423 |
| 1937 ...... | 903,113(D) | 1,077,407 |
| 1938 ...... | 1,243,916(D) | 225,431 |
| 1939 (first ten months) | 1,061,883 | 1,174,717 |

(D)—Deficit.

The capitalization permitted by these earnings is a mere matter of computation,[13]

which will demonstrate that the Commission did not act arbitrarily in limiting capitalization nor the respective classes thereof.

In its original report the Commission, with the aid of its financial experts, has fully analyzed and discussed the traffic and revenue of the Debtor and its subsidiaries, also its earnings available for charges. The Commission closes its discussion of the latter subject with the statement: "A consideration of these recent data (reported subsequent to the preparation of the debtor's estimate), together with other data of record, convinces us that too great reliance may not be placed upon the debtor's estimate of future earnings, and that the capital structure of the reorganized company must be conservative." And again: "It is obvious, therefore, that based on the most optimistic estimate of earnings of record, the capitalization of the reorganized company must be maintained within strict limits if any material return on its capital stock is to be expected, and if the shares of its stock are not to become mere tokens for stock-market speculation."

■ It is objected that without a finding of insolvency in the bankruptcy sense, the

---

[13] The following results of computation are taken from the brief of the Institutional Bondholders for purposes of illustration: The earnings of the Debtor's system, as adjusted for the five years 1934 to 1938, inclusive, averaged $1,195,528; for the ten years 1929 to 1938, inclusive, $1,261,539; and for the seventeen years 1922 to 1938, inclusive, $2,350,000. If such average earnings be capitalized at 5% the capitalization based on earnings for the 1934–1938 period would amount to $23,910,560; for the 1929–1938 period to $25,230,780, and for the 1922–1938 period to $47,000,000. Each such capitalization is substantially less than the $65,819,422 of senior par value securities provided for in the Commission plan.

In order to permit a capitalization equal in amount only to the $65,819,422 par value of senior securities contemplated by the Commission plan (thus disregarding entirely the no par value common stock) the 1934–1938 average earnings would have to be capitalized on a 1.81% basis; the 1929–1938 average earnings on a 2.00% basis; the 1922–1938 average earnings on a 3.57% basis; and the 1939 adjusted earnings on a 2.34% basis.

The average system earnings for the five years ending December 31, 1938, were insufficient by $753,432 to cover the total charges through interest on the new income mortgage bonds, and by $2,452,142 to cover the charges through dividends on the new preferred stock, under the Commission plan.

The average earnings for the ten year period ending December 31, 1938, were insufficient by $687,521 to cover the total charges through the interest on the new income mortgage bonds, and by $2,386,131 to cover the charges through dividends on the new preferred stock, under the Commission plan.

The average system earnings for the seventeen year period ending December 31, 1938, were sufficient to cover the total charges through interest on the new income mortgage bonds under the Commission plan, with $400,940 to spare, but were insufficient by $1,297,670 to cover the charges through the dividends on the new preferred stock.

The system earnings for the year 1939, as adjusted, were insufficient by $409,200 to cover the total charges through interest on the new income mortgage bonds, and by $2,107,810 to cover the charges through dividends on the new preferred stock.

provision of the Commission plan excluding stockholders from participation in the reorganization is invalid and inequitable and contrary to the law of the land. The statute makes no such requirement. Subsection e of 77 provides for the following five alternatives: "(a) that at the time of the finding the corporation is insolvent, *or* that at the time of the finding the equity of such class of stockholders has no value, *or* that the plan provides for the payment in cash to such class of stockholders of an amount not less than the value of their equity, if any, *or* (b) that the interests of such class of stockholders will not be adversely and materially affected by the plan, *or* (c) that the debtor has pursuant to authorized corporate action accepted the plan and its stockholders are bound by such acceptance." [Emphasis supplied.]

The Commission's finding that the equity of certain stockholders was without value, is based upon the second alternative. In In Re 620 Church Street Building Corp., 299 U.S. 24, 57 S.Ct. 88, 81 L.Ed. 16, a ruling in a reorganization case, under section 77B, 11 U.S.C.A. § 207, excluding creditors and stockholders upon a finding that their claims had "no value," was sustained.

■■■ In Consolidated Rock Products Co. et al. v. E. Blois Du Bois,[14] a reorganization case under section 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, (containing in some of its provisions terms identical with those in section 77), the Circuit Court of Appeals, for the Ninth Circuit, used the following language which is applicable here:

"* * * A corporation may come within the terms of § 77B although it is not insolvent, but 'unable to meet its debts as they mature'. Continental Illinois Nat. Bank v. [Chicago] Rock Island [& P.] R. [Co.], 294 U.S. 648, 672, 55 S.Ct. 595, 604, 79 L.Ed. 1110. The statute requires a proposed plan to be 'fair and equitable' regardless of the condition of the corporation, whether it be solvent or insolvent. The statute does not limit the test, 'fair and equitable', to plans of reorganization of insolvent corporations, but lays down the requirement that a plan must be 'fair and equitable' for all corporations seeking relief under § 77B. We think a proposed plan of reorganization under § 77B must be 'fair and equitable', whether the corporation sought to be reorganized is solvent or insolvent.

* * *

"Considerable argument is made to the effect that the debtor's preferred stockholders are 'forgotten men'; that they lose 96% of their investment; and that they have an equity and must be given an interest in any plan of reorganization. We are not impressed by this argument. When a person buys a bond, he obtains it on the theory that he is not an owner but a creditor. When a person buys stock, common or preferred, he knows that he is buying an interest in the corporation which is subordinate to claims of the corporate creditors. He runs the risk of having an interest in something that is valueless."

■■■ The two issues of (1) amount and character of capitalization and (2) distribution of new securities are closely related. The determination of the amount and character of the capitalization (a legislative function affecting the public interest) is exclusively within the province of the Commission. The only qualification, if any, is that the court shall independently determine whether, in the exercise of its jurisdiction, the Commission has acted fairly, within the bounds of the Constitution, and not arbitrarily. The determination of the questions relating to the distribution of the new securities, including legal priorities and allocations, involves private rights and is a judicial function, within the province of the court. However, since these private property rights had not been adjudicated, it became the duty of the Commission to determine them preliminarily for the purpose of considering the plans before it. 230 I.C.C. 61, 97. Without such consideration and determination, it would have been impossible for the Commission to have complied with the statute and certified a plan to the court. While the decision of the Commission in the premises is advisory only, it was of inestimable value to the court in enabling it to see the whole picture and arrive at a decision. In this connection I wish to say that I have read the record and carefully considered all of the objections offered by the respective objectors to the Commission plan. I have also read the briefs of respective counsel in support of the objections. I am wholly in accord

_____

14 9 Cir., 114 F.2d 102, decided June 19, 1940.

with the conclusions reached by the Commission upon both issues and all matters incidentally related thereto. It seems to me that further discussion would be superfluous. Every question presented by the objections was considered and passed upon by the Commission as shown by its original and supplemental reports.

Objections to the administration or execution of the Commission plan are without merit and will be overruled.

Petitions for allowance for compensation for services rendered and for expenses (including reasonable counsel fees) incurred, in connection with the proceeding and plan of reorganization up to and including October 31, 1939, were filed by the following persons, corporations, and committees: the Debtor and its counsel; the Institutional Bondholders Committee and its counsel; Crocker First National Bank of San Francisco as Corporate Trustee under the First Mortgage and Samuel Armstrong as Individual Trustee under the First Mortgage; the Chase National Bank of the City of New York, as Trustee (until November 13, 1936) under the Refunding Mortgage; Irving Trust Company, as successor Trustee under the Refunding Mortgage; A. C. James Co. and its counsel; and Reconstruction Finance Corporation. Said petitions were referred under the provisions of the Act to the Commission to fix the maximum limits of final allowances. The Commission filed in this court on June 1, 1940, a certified copy of its report and order fixing the maximum limits for allowances for fees and expenses. The matter came on regularly for hearing before the court on August 5, 1940. Counsel for A. C. James Co. moved that the court postpone the consideration of allowances, other than certain ad interim administration expenses. The motion will be denied. The Irving Trust Company, as successor Trustee under the general and refunding mortgage, moved (1) for payment out of the general estate of the Debtor of the compensation and expenses of itself and its counsel in the maximum limits fixed by the Commission, and (2) for payment of the balance of reasonable compensation of the Trustee and its counsel out of the cash held by said Trustee. The motion was based upon the contention that the allowances made were unreasonably low and that "it is not entirely clear whether or not the Commission intended to fix maximum limits of compensation payable out of the general estate for *all* services of the Trustee and its attorneys." An examination of the report and order of the Commission shows that in no case did the Commission allow as a maximum the amount claimed for compensation. All claims appear to have been treated upon a comparative basis. And it further appears from the report that allowances were made for all services rendered. The motion will be denied. I am of the opinion that the amounts allowed by the Commission as compensation for services rendered and for actual and reasonable expenses (including attorneys' fees) incurred are reasonable, and they will be approved.

Upon a consideration of the entire record I am of the opinion that the Commission plan complies with the provisions of subsection b of section 77 and is supported by the evidence; that it is fair and equitable; that it affords due recognition to the rights of each class of creditors and stockholders; that it does not discriminate unfairly in favor of any class of creditors or stockholders; that it will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders; and that it provides for payment of all costs of administration and other allowances made or to be made by this court.

All objections to the Commission plan will therefore be overruled and the plan will be approved in toto.

## Order Approving Plan of Reorganization for Debtor

These proceedings coming on for hearing on the modified plan of reorganization for the Debtor, approved by the Interstate Commerce Commission in its Report and Order entered June 21, 1939, and certified to this Court by said Commission on September 28, 1939, together with a transcript of the proceedings before said Commission and a copy of its said Report and Order approving said modified plan, and the Court having considered the entire record in these proceedings, including the transcript of the proceedings before said Commission certified to this Court and the evidence adduced and arguments presented at the hearing before this Court on January 22 to 25, 1940, and the Court having heretofore on August 15, 1940, filed its opinion herein,

The Court Finds:

1. The findings of fact made by the Interstate Commerce Commission in its Orig-

inal Report of October 10, 1938, as modified by its Supplemental Report of June 21, 1939, are supported by the evidence, and as supplemented by the stipulation of the parties filed herein on December 20, 1939, are adopted as findings by this Court.

2. The Plan of Reorganization, approved by the Report and Order of the Interstate Commerce Commission of June 21, 1939:

(a) Includes provisions modifying and altering the rights of creditors of the Debtor;

(b) Provides for fixed charges (including fixed interest on funded debt, interest on unfunded debt, amortization of discount on funded debt, and rent for leased railroads) in such an amount that, after due consideration of the probable prospective earnings of the property, in light of its earnings experience and all other relevant facts, there should be adequate coverage of such fixed charges by the probable earnings available for the payment thereof;

(c) Provides adequate means for the execution of the Plan; and

(d) In all other respects complies with the provisions of Subsection b of Section 77.

3. Said Plan of Reorganization:

(a) Is fair and equitable;

(b) Affords due recognition to the rights of each class of creditors and stockholders;

(c) Does not discriminate unfairly in favor of any class of creditors or stockholders;

(d) Will conform to the requirements of the law of the land regarding the participation of the various classes of creditors and stockholders; and

(e) Provides for payment of all costs of administration and all other allowances made or to be made by this Court.

4. By order entered August 15, 1940, this Court fixed the amount to be paid by the Debtor, or any corporation acquiring its assets, for fees and expenses incident to the reorganization through October 31, 1939. Said amounts are reasonable and within maximum limits heretofore fixed by the Interstate Commerce Commission and said order constitutes full disclosure of the approximate amounts to be paid by the Debtor, or such other corporation, for such fees and expenses so far as they could be ascertained at the date of said hearing before this Court on January 22 to 25, 1940. Such additional amount as may be required to be paid by the Debtor or such other corporation for services performed and expenses incurred (including reasonable attorneys' fees) after October 31, 1939, in connection with the proceeding and plan of reorganization, and in connection with the carrying out of said plan, if the same is finally confirmed, cannot be ascertained at this time, but such amounts will be subject to the approval of this Court within maximum limits hereinafter to be fixed by the Interstate Commerce Commission.

5. By order entered August 20, 1935, this Court divided the creditors and stockholders of the Debtor into classes and the classes of creditors hereinafter referred to are those fixed by said order.

Wherefore, it is ordered:

First: The objections to the Plan of Reorganization approved by the Report and Order of the Interstate Commerce Commission of June 21, 1939, and the claims for equitable treatment heretofore filed herein by or on behalf of the Debtor, the Institutional Bondholders Committee, the Trustee under the Debtor's General and Refunding Mortgage, A. C. James Co., Reconstruction Finance Corporation, The Railroad Credit Corporation, The Western Pacific Railroad Corporation and The Western Realty Company are hereby severally overruled and denied.

Second: Said Plan of Reorganization is hereby in all respects approved.

Third: The findings made by the Interstate Commerce Commission that the interests of the following classes of creditors:

(a) The Debtor's equipment obligations to be assumed by the Reorganized Company, being classes 6, 7, 8, and 9;

(b) Claims against the Debtor entitled to priority over any mortgage of the Debtor, current liabilities and obligations incurred by the Trustees of the Debtor during this reorganization proceeding, and expenses of reorganization allowed by this Court within the maximum limits fixed by the Interstate Commerce Commission, which shall be paid in cash or assumed by the Reorganized Company, and which are unclassified;

(c) Executory contracts of the Debtor which have been affirmed or have not been disaffirmed by the Trustees of the Debtor and not terminating prior to the conclusion of this reorganization proceeding which are to be assumed by the Reorganized Company and which are unclassified;

(d) Executory contracts made by the Trustees of the Debtor with the approval of this Court which by their terms do not terminate at or prior to the conclusion of this reorganization proceeding, which are to be assumed by the Reorganized Company, and which are unclassified; and

(e) All taxes levied, assessed or accrued against the Debtor or its property or against any subsidiary and remaining unpaid at the date of the confirmation of the plan, which are to be assumed and paid by the Reorganized Company with the same relative priority that they now have with respect to other obligations of the Debtor;

will not be adversely and materially affected by said Plan of Reorganization is hereby affirmed, and said Plan of Reorganization shall not be submitted to any of such classes for acceptance or rejection.

Fourth: The finding of the Interstate Commerce Commission that, at the time of the finding, the interests of unsecured creditors of the Debtor and the equity of the holders of the Debtor's Preferred Stock and the Debtor's Common Stock have no value, and that the holders of such unsecured claims and such shareholders are not entitled to participate in the distribution of new capital securities or other assets of the Debtor under said Plan of Reorganization is hereby affirmed, and said Plan of Reorganization shall not be submitted to said unsecured creditors or shareholders for acceptance or rejection.

Fifth: The only classes of creditors to whom said Plan of Reorganization shall be submitted for acceptance or rejection are:

(a) Class (1)—holders of claims evidenced by The Western Pacific Railroad Company First Mortgage 5% Bonds due March 1, 1946, issued under the First Mortgage of the Western Pacific Railroad Company dated June 26, 1916, and the interest coupons appurtenant thereto;

(b) Class (3)—Debtor's secured promissory notes issued to A. C. James Co., dated March 28, 1932, and May 31, 1932, respectively, bearing interest at the rate of 5% per annum and due March 28, 1935, and May 31, 1935, respectively, together with the accrued and unpaid interest thereon;

(c) Class (4)—Debtor's secured promissory notes to Reconstruction Finance Corporation, dated March 1, 1932, June 29, 1932, August 1, 1932, August 30, 1932, and March 25, 1933, respectively, bearing interest at the rate of 6% per annum, and due March 1, 1935, June 29, 1935, August 1, 1935, August 30, 1935, and March 25, 1936, respectively, together with accrued and unpaid interest thereon;

(d) Class (5)—Debtor's secured promissory notes to the Railroad Credit Corporation, dated June 29, 1932, and March 25, 1933, respectively, bearing interest at the rate provided for in the Marshalling and Distributing Plan, 1931, of the Railroad Credit Corporation, each note payable on demand, together with accrued and unpaid interest thereon.

Sixth: T. M. Schumacher and Sidney M. Ehrman, Trustees of the Debtor, be, and they are hereby directed to send a certified copy of this Order and a certified copy of the opinion of this Court filed herein on August 15, 1940, to the Interstate Commerce Commission for use in submitting said Plan of Reorganization hereby approved to the holders of said claims and interests found to be entitled to vote thereon.

Order Making Allowances to Various Parties in Interest for Fees and Expenses

This cause coming on for further hearing upon the petitions of various parties in interest requesting the making of allowances for fees and expenses incurred in connection with the Proceeding and Plan of Reorganization, and upon the Report and Order of the Interstate Commerce Commission entered May 27, 1940, fixing the maximum limits for allowances for fees and expenses incurred in connection with the Proceeding and Plan of Reorganization, and notice of the time for filing applications for fees and expenses and of the hearing given thereon having been duly given creditors, stockholders and other interested parties, as required by Subsection c (8) of Section 77 of the Federal Bankruptcy Act, as amended, and a hearing having been held pursuant to said notice and oral argument having been heard upon said petitions, and the Court having considered said petitions, all affidavits filed in support thereof, the transcript of testimony heard before the Interstate Commerce Commission on February 26 and 27, 1940, which said transcript was transmitted to this Court by said Commission and filed in this proceeding on June 3, 1940, and the Court having considered the entire record in these proceedings:

It is ordered:

I. That there be, and there are hereby, allowed the following amounts as compen-

508

sation for services rendered, and for actual and reasonable expenses (including reasonable attorneys' fees) incurred in connection with these proceedings and said Plan of Reorganization through October 31, 1939.

(1) To Pierce and Greer $35,000 as compensation for such services as counsel for the Debtor.

(2) To Reconstruction Finance Corporation, a secured creditor of the Debtor, $984.47 for such expenses.

(3) To Crocker First National Bank of San Francisco, Corporate Trustee, and Samuel Armstrong, Individual Trustee, under the First Mortgage of the Debtor, $32,554.11 as such compensation and for such expenses (including attorneys' fees), said sum to be paid to the following persons or firms in the following amounts:

(a) Crocker First National Bank of San Francisco and Samuel Armstrong jointly:
Compensation for services through October 31, 1939 .. $10,000.00
(b) Crocker First National Bank of San Francisco:
Disbursements ........... 354.94
(c) Samuel Armstrong:
Disbursements ........... 2,199.17
(d) Milbank, Tweed & Hope and Chickering & Gregory, jointly:
Compensation for legal services through October 31, 1939 ............... 20,000.00

(4) To the Chase National Bank of the City of New York, Trustee until November 13, 1936, under Debtor's General Refunding Mortgage, $5,583.16 as such compensation and for such expenses (including attorneys' fees), said sum to be paid to the following persons or firms in the following amounts:

(a) The Chase National Bank of the City of New York:
Compensation for services through November 13, 1936 $1,000.00
Disbursements ........... 1,083.16
(b) Milbank, Tweed & Hope:
Compensation for legal services through November 13, 1936 .................. 2,000.00
(c) Pillsbury, Madison & Sutro:
Compensation for legal services through November 13, 1936 .................. 1,500.00

(5) To Irving Trust Company, Trustee since November 13, 1936, under Debtor's General Refunding Mortgage, $16,602.49 as such compensation and for such expenses (including attorneys' fees), such sum to be paid to the following persons or firms in the following amounts:

(a) Irving Trust Company:
Compensation for services through October 31, 1939... $4,000.00
Disbursements ........... 1,602.49
(b) Davies, Auerbach, Cornell & Hardy:
Compensation for legal services through October 31, 1939 ................. 9,000.00
(c) Pillsbury, Madison & Sutro:
Compensation for legal services through October 31, 1939 .................... 2,000.00

(6) To Frederick H. Ecker, John W. Stedman and Reeve Schley, as a committee representing a group of holders of First Mortgage Bonds of the Debtor, $64,190.91 for such expenses (including attorneys' fees), said sum to be paid to the following persons or firms in the following amounts:

(a) The Committee:
Reimbursement of actual out-of-pocket expenses.... $11,867.34
(b) Cravath, de Gersdorff, Swaine & Wood:
Compensation for legal services through October 31, 1939 ................. 50,000.00
Disbursements ........... 2,323.57

(7) To A. C. James Co., a secured creditor of the Debtor, $14,839.61 for such expenses (including attorneys' fees), said sum to be paid to the following persons or firms in the following amounts:

(a) A. C. James Co.:
Reimbursement of actual out-of-pocket expenses.... $ 4,839.61
(b) Whitman, Ransom, Coulson & Goetz:
Compensation for legal services through October 31, 1939 ................. 10,000.00

II. That T. M. Schumacher and Sidney M. Ehrman, Trustees of the properties of the Debtor, be and they hereby are authorized and directed to pay forthwith each and every of the foregoing allowances out of the Debtor's estate.

III. The allowances hereby granted, and the payment thereof, are without prejudice to any right to file further petitions with respect to the period subsequent to October 31, 1939, or any right of any mortgage trustee under such mortgage for compensation for services rendered, or for reimbursement of expenses (including counsel fees) incurred, pursuant to such mortgage but not in connection with the Proceeding and Plan of Reorganization; and the Court retains jurisdiction in respect thereof.