PALMER ET AL., TRUSTEES, *v.* MASSACHUSETTS.

No. 7.  Argued October 11, 1939.—Decided November 6, 1939.

*Mr. Edward R. Brumley,* with whom *Messrs. Fred N. Oliver, Willard P. Scott, Oscar M. Shaw,* and *R. Ammi Cutter* were on the brief, for petitioners.

*Mr. Edward O. Proctor,* Assistant Attorney General of Massachusetts, with whom *Mr. Paul A. Dever,* Attorney General, was on the brief, for respondent.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

October 23, 1935, opened another chapter in the long history of the vicissitudes of the New York, New Haven and Hartford Railroad Company.[1] By filing a petition for reorganization under § 77 of the Bankruptcy Act (47 Stat. 1474, as amended by 49 Stat. 911 and 49 Stat. 1969,

---

[1] Brandeis, "Financial Condition of the New York, New Haven and Hartford Railroad Co." (1907); The New England Investigation, 27 I. C. C. 560 (1913); In re Financial Transactions of the New York, New Haven and Hartford Railroad Co., 31 I. C. C. 32 (1914); Report of the Joint New England Railroad Committee to the Governors of the New England States. (Storrow Report.) (1923.)

11 U. S. C. § 205), the New Haven invoked the shelter of the United States District Court for the District of Connecticut. There it has since remained. An episode in this new chapter, already four years old, is presented by this case. We brought it here, 306 U. S. 627, because it raises important questions under the railroad bankruptcy law, particularly where it intersects the regulatory systems of the states. The District Court assumed power to supplant the relevant authority of the state—an authority which, apart from proceedings under § 77, has not been conferred by Congress either upon the federal courts or the Interstate Commerce Commission. The Circuit Court of Appeals, one judge dissenting, reversed the District Court, *Converse* v. *Massachusetts*, 101 F. 2d 48.

A summary of the facts will lay bare the legal issues. On December 28, 1937, the bankruptcy Trustees of the New Haven, acting under the requirements of Massachusetts law,[2] applied to that Commonwealth's Department of Public Utilities for leave to abandon eighty-eight passenger stations.[3] Twenty-one hearings were held by

---

[2] Mass. Gen. Laws (Ter. Ed.) c. 160, § 128, provides: "A railroad corporation which has established and maintained a passenger station throughout the year for five consecutive years at any point upon its railroad shall not abandon such station . . . nor substantially diminish the accommodation furnished by the stopping of trains thereat as compared with that furnished at other stations on the same railroad, except with the written approval of the department [of Public Utilities] after notice posted in and on said station for a period of thirty days immediately preceding a public hearing thereon."

See also Mass. Gen. Laws (Ter. Ed.) c. 159, § 16, vesting general control over intrastate railway services in the Department of Public Utilities.

[3] The application also sought permission to effect certain other curtailments of passenger service. Some of the stations were situated on the lines of the New Haven, most of them on the lines of the Old

the Department on the questions raised by this application. During the pendency of these hearings and before the Department had taken any action, the present litigation was initiated in the New Haven bankruptcy proceedings by creditors of the debtor for an order directing the Trustees to abandon these local services. The Trustees joined in the prayer, while the Commonwealth denied the jurisdiction of the District Court and asked that the proceedings before the Department be allowed to reach fruition. The District Judge ruled that § 77 gave him the responsibility of disposing of the petition on its merits and, having taken evidence, gave the very relief for which the Trustees had applied to the Department and which was still in process of orderly consideration.

Plainly enough the District Court had no power to deal with a matter in the keeping of state authorities unless Congress gave it. And so we have one of those problems in the reading of a statute wherein meaning is sought to be derived not from specific language but by fashioning a mosaic of significance out of the innuendoes of disjointed bits of a statute. At best this is subtle business, calling for great wariness lest what professes to be mere rendering becomes creation and attempted interpretation of legislation becomes legislation itself. Especially is wariness enjoined when the problem of con-

---

Colony Railroad, and some on the lines of the Boston and Providence Railroad.

The New Haven in 1893 leased for 99 years all the properties of the Old Colony, including the Boston and Providence lines which the Old Colony had leased for 99 years in 1888. On June 1, 1936, the New Haven Trustees disaffirmed, as they were empowered to do under § 77, the Old Colony lease. After the disaffirmance the New Haven operated the lines on account of the Old Colony. On June 3, 1936, the Old Colony itself commenced proceedings under § 77. The Trustees of the New Haven were then appointed trustees for the Old Colony.

struction implicates one of the recurring phases of our federalism and involves striking a balance between national and state authority in one of the most sensitive areas of government.

To be sure, in recent years Congress has from time to time exercised authority over purely intrastate activities of an interstate carrier when, in the judgment of Congress, an interstate carrier constituted, as a matter of economic fact, a single organism and could not effectively be regulated as to some of its interstate phases without drawing local business within the regulated sphere.[4] But such absorption of state authority is a delicate exercise of legislative policy in achieving a wise accommodation between the needs of central control and the lively maintenance of local institutions.[5] Therefore, in construing legislation this court has disfavored inroads by implication on state authority and resolutely confined restrictions upon the traditional power of states to regulate their local transportation to the plain mandate of Congress. *Minnesota Rate Cases,* 230 U. S. 352; *cf. Kelly* v. *Washington ex rel. Foss Co.,* 302 U. S. 1.

The dependence of local communities on local railroad services has for decades placed control over their curtailment within the regulatory authorities of the states.[6]

---

[4] E. g., *The Shreveport Cases,* 234 U. S. 342; *Railroad Comm'n of Wisconsin* v. *Chicago, B. & Q. R. Co.,* 257 U. S. 563. See I Sharfman, "The Interstate Commerce Commission," pp. 82–86, 219–225. For the careful observance of state interests in applying the Shreveport doctrine, see *Illinois Central R. Co.* v. *Public Utilities Comm'n,* 245 U. S. 493 and *Florida* v. *United States,* 282 U. S. 194.

[5] See Clark, "The Rise of a New Federalism," *passim.*

[6] The controlling Massachusetts statute has been in force since 1911. But Massachusetts has exercised control over its railroads through administrative machinery ever since the famous Adams Commission in 1869. See First Annual Report, Board of Railroad Commissioners of Massachusetts, Public Document No. 40, pp. 3–12 (1870); Hadley, "Railroad Transportation" (1885 ed.) pp. 136–139.

Even when the Transportation Act in 1920 gave the Interstate Commerce Commission power to permit abandonment of local lines when the over-riding interests of interstate commerce required it, *Colorado v. United States,* 271 U. S. 153,[7] this was not deemed to confer upon the Commission jurisdiction over curtailments of service and partial discontinuances. Public Convenience Application of Kansas City Southern Ry., 94 I. C. C. 691; see Proposed Abandonment, Morris & Essex Co., 175 I. C. C. 49. If this old and familiar power of the states was withdrawn when Congress gave district courts bankruptcy powers over railroads, we ought to find language fitting for so drastic a change.

We are asked to find it in § 77 (a) granting to the bankruptcy court "exclusive jurisdiction of the debtor and its property wherever located," [8] and in § 77 (c) (2) permitting the trustees, subject to the court's control, "to operate the business of the debtor." [9] In order to expedite the reorganization of insolvent railroads, such broad and general provisions doubtless suffice to confer

---

[7] For illustration of the scrupulous regard for local authority and local interests shown by the Commission in the exercise of its control over abandonments, see II Sharfman, "The Interstate Commerce Commission," pp. 264–269.

[8] Section 77 (a), 47 Stat. 1474, as amended in 1935 by 49 Stat. 911, 11 U. S. C. § 205 (a) provides so far as here relevant: "If the petition is so approved, the court in which such order is entered shall, during the pendency of the proceedings under this section and for the purposes thereof, have exclusive jurisdiction of the debtor and its property wherever located, and shall have and may exercise in addition to the powers conferred by this section all the powers, not inconsistent with this section, which a Federal court would have had if it had appointed a receiver in equity of the property of the debtor for any purpose."

[9] "The trustee or trustees so appointed . . . shall have . . . subject to the control of the judge and the jurisdiction of the Commission as provided . . . the power to operate the business of the debtor." § 77 (c) (2), 47 Stat. 1475, as amended by 49 Stat. 914–15, 11 U. S. C. § 205 (c) (2).

upon the district courts power appropriate for adjusting property rights in the railroad debtor's estate and, as to such rights, beyond that in ordinary bankruptcy proceedings. Cf. *Continental Bank* v. *Chicago, R. I. & P. Ry. Co.*, 294 U. S. 648. But the District Court claimed power over the carrier's relation to the state. It has become the settled social policy both of the states and the nation to entrust the type of public interest here in question to expert administrative agencies because of "the notion," as Judge Learned Hand pointed out below, "that a judge is not qualified for such duties." [10]

Not only is there no specific grant of the power which the District Court exercised, but the historic background of § 77, the considerations governing Congress in its enactment, and the scheme of the legislation as disclosed by its specific provisions reject the claim. Until the amendment of March 3, 1933, railroads were outside the Bankruptcy Act. [11] But the long history of federal railroad receiverships, with the conflicts they frequently engendered between the federal courts and the public, left an enduring conviction that a railroad was not like an ordinary insolvent estate. [12] Also an insolvent railroad, it was realized, required the oversight of agencies specially charged with the public interest represented by the transportation system. Indeed, when, in the depth of

---

[10] See *Converse* v. *Massachusetts*, 101 F. 2d 48, at 51.

[11] See H. Rep. No. 1897, 72d Congress, 2d Session, p. 5.

[12] See Chapter XXII "Railroad Receiverships" in I Gresham, "The Life of Walter Quintin Gresham," pp. 366–378; Jacobs "The Interstate Commerce Commission and Interstate Railroad Reorganizations," 45 Harv. L. Rev. 855; Lowenthal "The Investor Pays." See also remarks by Senator Wheeler, as Chairman of the Committee on Interstate Commerce, introducing the amendment of 1935, 79 Cong. Rec., Pt. 13, p. 13764.

the depression, legislation was deemed urgent to meet the grave crisis confronting the railroads, there was a strong sentiment in Congress to withdraw from the courts control over insolvent railroads and lodge it with the Interstate Commerce Commission.[13] Congress stopped short of this remedy. But the whole scheme of § 77 leaves no doubt that Congress did not mean to grant to the district courts the same scope as to bankrupt roads that they may have in dealing with other bankrupt estates.

The judicial process in bankruptcy proceedings under § 77 is, as it were, brigaded with the administrative process of the Commission. From the requirement of ratification by the Commission of the trustees appointed by the court to the Commission's approval of the court's plan of reorganization the authority of the court is intertwined with that of the Commission.[14] Thus, in § 77 (c) and

---

[13] See 76 Cong. Rec., Pt. 5, p. 5358 (remarks of Representative La-Guardia): "I would like to see the entire reorganization taken from the courts and placed in the Interstate Commerce Commission." The suggestion for administrative receiverships originated with the late Chief Justice Taft, when Circuit Judge, in an address before the American Bar Association. Taft, "Recent Criticism of the Federal Judiciary," Reports of the American Bar Association (1895) 237, 264.

[14] Section 77 (c) (1) requires the appointment of trustees to be ratified by the Commission; § 77 (c) (2) gives the Commission supervision over the compensation paid to trustees and their counsel; § 77 (c) (3) permits the issuance of trustees' certificates only with the Commission's approval; § 77 (c)(9) permits the Commission, on request of the court, to investigate facts pertaining to mismanagement of the debtor; § 77 (c) (10) empowers the Commission to set up accounts for the allocation of earnings among the various portions of the debtor's lines; § 77 (c) (11) empowers the Commission to file reports as to the debtor's property, prospective earnings, etc., and gives to the facts stated in such reports a presumption of correctness; § 77 (c) (12) gives the Commission supervision over allowances for the expenses of

§ 77 (o) the power of the district courts to permit abandonments is specifically conditioned on authorization of such abandonments by the Commission. In view of the judicial history of railroad receiverships and the extent to which § 77 made judicial action dependent on approval by the Interstate Commerce Commission, it would violate the traditional respect of Congress for local interests and for the administrative process to imply power in a single judge to disregard state law over local activities of a carrier the governance of which Congress has withheld even from the Interstate Commerce Commission, except as part of a complete plan of reorganization for an insolvent road.[15] About a fourth of the railroad mileage of

various parties in interest in connection with the reorganization pro-. ceedings; §§ 77 (d) and 77 (e) give to the Commission control over any proposed plan of reorganization; § 77 (p) gives to the Commission control over the solicitation of proxies or deposit agreements.

See also H. Rep. No. 1897, 72d Congress, 2d Session, pp. 5–6; H. Rep. No. 1283, 74th Congress, 1st Session, pp. 3–5; S. Rep. No. 1336, 74th Cong., 1st Session, pp. 4–6; Report, Federal Coordinator of Transportation, 1934, H. Doc. No. 89, 74th Cong., 1st Session, pp. 100–101; 76 Cong. Rec., Pt. 5, pp. 5108–5110; 79 Cong. Rec., Pt. 12, p. 13301, Pt. 13, pp. 13764, 13767.

[15] "Upon confirmation of the plan, the debtor and any other corporation or corporations organized or to be organized for the purpose of carrying out the plan, shall have full power and authority to, and shall put into effect and carry out the plan and the orders of the judge relative thereto . . . the laws of any State or the decision or order of any State authority to the contrary notwithstanding." § 77 (f).

The records of the Interstate Commerce Commission disclose that eight plans of reorganization have thus far been filed with the District Court in the New Haven proceedings and transmitted to the Interstate Commerce Commission. Proceedings before the Commission had progressed to the point where an examiner's report was filed; but the report was withdrawn for further hearings. The present record fails to show what, if any, disposition of the Old Colony lines any of these plans proposed to make.

the country is now in bankruptcy.[16]   The petitioners ask us to say that district judges in twenty-nine states have effective power, in view of the weight which often attaches to findings at *nisi prius,* to set aside the regulatory systems of these twenty-nine states with all the consequences implied for those communities.   Congress gave no such power.

Arguments of convenience against denial of the existence of this power have been strongly pressed upon us. Continuance of state control over these local passenger services will, it is urged, impair the bankruptcy court's power to formulate a reorganization plan for the approval of the Interstate Commerce Commission.   Such embarrassments, due either to the time required for exhaustion of the orderly state procedure or to the financial losses that may be involved in the continuance of local services until duly terminated by the state, may easily be exaggerated.   It is not without significance that after four years no reorganization plan for the New Haven has yet been evolved.   Perhaps it is no less true that amenability to state laws will serve as incentive to the formulation of reorganization plans which, on approval by the Commission, do supplant state authority.   But, in any event, against possible inconveniences due to observance of state law we must balance the feelings of local communities, the dislocation of their habits and the over-riding of expert state agencies by a single judge sitting, as in this case, in another state, removed from familiarity with local problems, and not necessarily gifted with statesman-like imagination that transcends the wisdom of local attachments.

---

[16] On October 23, 1939, there were 61,292.69 miles of railroad in bankruptcy proceedings under § 77.   This mileage includes lines in 29 states.

90

Other arguments, drawn from the legislative history of § 77 and from the general equity powers conferred by § 77(a) and § (77)(c)(2),[17] were urged but we deem it unnecessary to say more.

The decree below is

*Affirmed.*

MR. JUSTICE BUTLER took no part in the consideration and decision of this cause.

---

[17] *In re Tyler,* 149 U. S. 164, and other decisions of this Court cited by petitioners deal with attempts at "physical invasion" of the properties held in the custody of a federal court. See 149 U. S. at 182. Section 65 of the Judicial Code (36 Stat. 1104, 28 U. S. C. § 124) decisively indicates that Congress did not intend that those who operate a business under the control of a federal court should be immune from the regulatory authority of the several states any more than they are from their taxing power.