**BENTON et al. v. CALLAWAY et al.**
**No. 12130.**

Circuit Court of Appeals, Fifth Circuit.
Jan. 13, 1948.
Writ of Certiorari Granted March 15, 1948.
See 68 S.Ct. 736.

HUTCHESON, Circuit Judge, dissenting.

Charles J. Bloch and Ellsworth Hall, Jr., both of Macon, Ga., for appellants.

T. M. Cunningham, of Savannah, Ga., and Wallace Miller and Walter A. Harris, both of Macon, Ga., for appellees.

Before HUTCHESON, HOLMES, and LEE, Circuit Judges.

HOLMES, Circuit Judge.

This appeal is from a judgment of the court below, entered in the exercise of its bankruptcy jurisdiction, which permanently enjoined the appellants (individually and as members of a stockholders protective committee) from prosecuting a suit filed

in the Superior Court of Bibb County, Georgia. A temporary injunction had been issued by said state court against the officers and directors of the South Western Railroad Company, restraining them, without the unanimous consent of the stockholders, from the execution of any written instrument conveying to the debtor or its trustee the fee-simple title of the property of said railroad company. This injunction was annulled, and further proceedings in the state court enjoined, by the bankruptcy court. The issue presented here is whether the court below had jurisdiction to stay proceedings in the state court and to annul the action previously taken therein. More definitely, the question is: did the bankruptcy court, in a reorganization proceeding under Section 77, Bankr. Act, 11 U.S. C.A. § 205, have exclusive jurisdiction to determine whether the properties of South-Western legally could be acquired by the Central of Georgia, on the terms set forth in the plan, by a mere majority vote of the stockholders of South-Western? The answer to this question turns upon whether or not the bankruptcy court had jurisdiction in rem of property the conveyance of which had been enjoined by the state court. The facts are undisputed, and are substantially as follows:

The Central of Georgia Railway Company is the debtor in a reorganization proceeding under Section 77 of the Bankruptcy Act, as amended. The proceeding was filed by the debtor in the court below in 1940, and is now pending therein. Prior to 1940 (beginning in 1932), the debtor's properties were operated by a receiver appointed in an equity suit in the federal court. For many years prior to the suit in equity, the South Western Railroad Company was operated by the debtor under a lease dated June 24, 1869. A plan of reorganization of the debtor was promulgated by the Interstate Commerce Commission. It proposed to issue $14,000,000 of 4% first-mortgage bonds, due in 1995, and $16,000,000 of 4½% income-bonds due in 2022. It proposed the allotment to South-Western of $2,200,000 of first-mortgage bonds and $1,700,000 of income bonds if it would convey all of its leased property to the debtor. The allotment thus offered to South-Western was that proposed by the trustee of the debtor in the reorganization plan submitted by him.

Objections to the proposal by South-Western were unavailing in the district court. The bonds are to be issued by the reorganized company, but whether that will be the debtor or a new corporation is to be determined later by the reorganization managers. Upon confirmation of the plan, the reorganized company is required to have title to all the property of the debtor, but this requirement is not to be construed as prohibiting the rejection of any lease. The plan provides that, prior to its consummation, the debtor shall acquire the properties of three railroads leased to the company, including South-Western, if they can be acquired upon the terms specified in the plan. This provision may be disregarded as to one of the leased roads if the reorganized company shall not acquire the property of the South-Western Company. If any of these properties shall not be acquired as a result of the acceptance of the plan by the leased-line security holders, then the lease of any line not so acquired shall be disaffirmed. The method of acquisition, whether through purchase, merger, or consolidation, is to be determined by the trustee, or the reorganization managers when they begin to function. The importance to the debtor of acquiring South-Western is indicated by the fact that, if it fails to do so, the provision for the acquisition of the Chattahoochie & Gulf Railroad Company may be disregarded.

The South Western Railroad Company was incorporated under the laws of Georgia in 1845. Its capital stock is of the par value of $5,191,100, all of which is common stock. Its properties are free from mortgage or other liens. It owes no bonded indebtedness. Its current liabilities are less than $100,000. Its road and equipment were valued at $12,830,257 by the Interstate Commerce Commission in 1942, and at $9,523,736.81 by its board of directors in 1947. Its properties comprise some 340 miles of railroads, bridges, depots and appurtenances, in the southern portion of the Central of Georgia's railway system. Without the South-Western, the Central could not operate its trains from Florida

through Macon to the north and west; without it, the Central could not operate its trains from the coal fields in the vicinity of Birmingham to Savannah. Emanating from Macon, the lines of South-Western form part of Central's system through Fort Valley to Columbus, Georgia; and through Fort Valley to Americus, Smithville, Albany, Georgia, and Eufaula, Alabama. In addition to its railroad properties, South-Western has in its hands government and municipal securities of the market value, as of December 31, 1946, of $1,124,581.25. The plan does not contemplate the transfer of these securities to the reorganized company.

We think the bankruptcy court erred in attempting to exercise exclusive jurisdiction over property which the debtor did not own and upon which it had no lien. The debtor was in actual possession of the tangible property leased by it, but it held the same as lessee, not as owner in fee. The granting of a lease always supposes that the grantor reserves to himself a reversion in the leased premises. A leasehold estate is personal property which becomes subject to the exclusive jurisdiction of the bankruptcy court upon the filing of a petition by the debtor under said Section 77; but the lessor's title in fee, out of which the leasehold was carved, was not an asset of the debtor, and no claim of title thereto or lien thereon is made by the debtor or its trustee.

 The jurisdiction of the federal district courts sitting in bankruptcy is limited to matters conferred by statute expressly or impliedly. Such jurisdiction is paramount and exclusive in the administration of the bankrupt's estate. The basis of the court's exclusive jurisdiction in rem is its actual or constructive possession of the debtor's property.[1] It is not limited to the administration of property that belonged to the debtor without question, but extends to the determination of all questions of title or liens affecting the debtor's estate. It is not exclusive as to the right or title of a party not in bankruptcy to property not legally or equitably owned or claimed by the debtor. Section 77, sub. a provides that during the pendency of the reorganization proceedings the court shall have "exclusive jurisdiction of the debtor and his property wherever located." By 77, sub. c(2) the title and powers of the trustee are assimilated to those of trustees in ordinary bankruptcy proceedings. Meyer v. Fleming, supra.

In the instant case, the plan assumes that the fee of the leased lines will be acquired by the acceptance of the plan, and provides that, if not accepted, the lease of any such line shall be disaffirmed. Not only that, but the Act itself looks forward to the contingency of a lease being rejected and of the lessor being unable to operate the line. In this event, the Act provides that it shall be the duty of the lessee to continue operation of the line for account of the lessor until the abandonment of such line be authorized by the Commission.[2] There is no danger of the public interest being adversely affected by rejection of the lease and the inability of the lessor to operate the railroad.

The suit in the state court, which was enjoined by the judgment below, was a proceeding in personam, between parties not in reorganization, over property that might never be acquired by the reorganized company. The Commission recognized this fact, and expressly provided that nothing in the plan should be construed as a grant of authority for the transfer of the debtor's property until further action of the Commission. The plan contemplated that the leased lines should be acquired upon the terms stated in the plan. The question submitted to the state court for decision was whether or not the fee of South-Western's properties, exclusive of the lease, could be legally conveyed by the owner by a vote of a simple majority of its stockholders. This was peculiarly a question of state law.

---

[1] Schumacher v. Beeler, 293 U.S. 367, 55 S.Ct. 230, 79 L.Ed. 433; Continental Illinois Nat. Bank & Trust Co. v. Chicago, Rock Island & Pac. Ry. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110; Meyer v. Fleming, 327 U.S. 161, 66 S.Ct. 382, 90 L.Ed. 595; In re Retail Stores Delivery Corporation, D.C., 5 F.Supp. 892; In re Straus & Co., Inc., D.C., 6 F.Supp. 547; 11 U.S.C.A. §§ 11 and 46.

[2] 11 U.S.C.A. § 205, sub. c(6).

It was not a controversy over property in the actual or constructive possession of the trustee.

Whatever control the court below had over South-Western's assets was not by reason of the fact that its railroad properties were in the custody of the court, but simply because the leasehold estate was the property of the debtor. It was specifically pointed out by the Interstate Commerce Commission that no petitions for reorganization of the lessors had been filed. Undoubtedly the Commission intended that the reorganized company should get a good marketable title to the property in question.

If the leased lines shall be acquired, the plan provides that the railroads of each of the three, and all the real estate owned by each lessor, must be conveyed to the reorganized company; each of said lessors must waive any damage to which it has become or shall become entitled; and the South Western Railroad Company shall waive all claims in respect to equipment. Such conveyances and waivers will be the sole consideration of the delivery to each of the respective lessors of the securities proposed to be allocated to it as thereafter specified in the plan. There is much that needs to be done in carrying out the Commission's plan of reorganization, and the sooner an authoritative decision in the state court is obtained in the above suit, the nearer the parties may be to the consummation of that plan.

■ The modernization of American bankruptcy law by the enactment of Section 77 of the Act, and kindred legislation, did not alter, lessen, or abolish the several distinct classes of jurisdiction exercised by the bankruptcy court. Such jurisdiction in civil cases is either in rem or in personam, exclusive or concurrent, summary or plenary. The power to adjudicate as to bankruptcy, to grant or refuse discharges, to administer assets of the bankrupt, and to close estates, is exclusive. The exclusive jurisdiction of the district court in reorganization proceedings is that which bankruptcy courts have customarily possessed.[3] In entering the judgment in this case, annulling and staying proceedings in the state court, the bankruptcy court undertook in a summary proceeding to exercise exclusive jurisdiction in rem as to property that the trustee did not own but was seeking to acquire. The proceeding in the state court that was enjoined, and the injunction that was annulled, were strictly in personam. It does not appear from this record that the bankruptcy court had any jurisdiction whatever of that controversy; but, conceding that it did, such jurisdiction was concurrent, not exclusive, and should not have been exercised in a summary proceeding.[4]

The Commission envisaged a merger or consolidation as well as a purchase of the leased lines, but the activities of the trustee so far as this record shows have been directed principally to the acquisition of South Western's properties by purchase. The lessor has been made an offer for its property upon specific terms, which it must accept or reject. If it rejects the offer, its lease will be disaffirmed. There is nothing in the plan to indicate that an ultra vires acceptance is authorized or required, or that any state law which prohibits acceptance should be disregarded. The plan does not provide that the leased lines may be acquired by a simple majority vote of the stockholders of the company.

■ Because the debtor's trustee has actual possession under its lease of certain tangible property of the South Western Railroad Company, the trustee claims to be in possession of all the property in controversy. We do not concur in this contention. The debtor is seeking (not to enforce a lien upon tangible property as in Warren v. Palmer, 310 U.S. 132, 60 S.Ct. 865, 84 L.Ed. 1118, but) to acquire the incorporeal reversionary interest of its lessor, which arose by operation of law when the leasehold was carved out of the fee-simple

[3] Meyer v. Fleming, 327 U.S. 161, 66 S.Ct. 382, 90 L.Ed. 595, cited in Gardner v. New Jersey, 329 U.S. 565, 67 S.Ct. 364.

[4] Kline v. Burke Construction Co., 260 U.S. 226, 43 S.Ct. 79, 67 L.Ed. 226, 24 A.L.R. 1077; Central New England R. Co. v. B. & A. R. Co., 279 U.S. 415, 49 S.Ct. 358, 73 L.Ed. 770; Mandeville v. Canterbury, 318 U.S. 47, 49, 63 S.Ct. 472, 473, 87 L.Ed. 605.

title. This is a vested future interest to commence in possession after the determination of the lease. The lessee is not disputing the lessor's title, but is seeking to acquire it, and is claiming that the bankruptcy court is administering this intangible asset. The fallacy in the argument is this: In the case of a tangible res, there can be possession in fact as well as in contemplation of law; but in the case of something intangible, possession is purely a legal concept that manifests itself only through recognition of legal consequences.[5] So far as pertinent here, the legal consequences of a debtor's possession of a tangible asset at the time of his bankruptcy are that his trustee in bankruptcy succeeds to the debtor's possession; and that the bankruptcy court, acquiring possession thereby, has summary jurisdiction in rem to adjudicate adverse claims respecting the asset. Therefore, for practical reasons, the law attaches to the ownership of intangible property the legal consequences of possession of a tangible res. Thus in this case the law limits the possession of the lessee to the duration of the lease, while it attaches to ownership of the reversion in fee the legal consequences of possession. Such reversion, not being owned by Central at the time its petition for reorganization was filed, is in legal contemplation not now in possession of the bankruptcy court; and, since the law attributes to its mere ownership the legal consequences of possession, the bankruptcy court has no jurisdiction in rem of said reversionary interest.

■ It is well settled that the bankruptcy court has no summary or exclusive jurisdiction in rem of tangible property adversely held by a third party under a bona fide claim of ownership.[6] The same is true of intangible property, except that ownership of the latter carries with it the legal consequences of possession. In the case of a reversion, the law attributes to ownership the jurisdictional consequences of possession. To illustrate, let us suppose that South-Western were the debtor here, and that Central were a solvent corporation

holding under its lease. The bankruptcy court would have jurisdiction in rem of the reversion, but not of the leasehold.

From another angle, let us suppose that both Central and South-Western were insolvent, and that each was the debtor in a reorganization proceeding pending in different judicial districts. Can anyone doubt that one court would have jurisdiction in rem of the leasehold and another of the reversion? Then the symmetry of the Bankruptcy Act, as amended, would come into view. The federal judicial power would be exercised by the courts to the extent vested in them, and the delegated power of the Congress to regulate commerce would be exercised by the Interstate Commerce Commission. A harmonious plan of reorganization of both roads would be promulgated by the Commission, subject to the approval of one court as to Central and another court as to South-Western, with final jurisdiction in the Supreme Court.

■ A solvent corporation, which has appeared specially as creditor and lessor in a reorganization proceeding, cannot be constitutionally compelled against its will to convey to the debtor a larger and better title than was granted in the lease. The Commission knew this, and made provision for disaffirmance of the lease. Its use of the word "acquired" implied that something was to be added to the debtor's estate. The plan did not contemplate that the limited interest of the debtor in the leased lines should be converted into a fee-simple title without the consent of the owners. Such an economic blood transfusion is not strained; it is a matter of contract with the carrier that is not in reorganization.

The appellants here do not ask that the plan of the Commission be set aside or that the order of the court below approving it be reversed. They ask that full effect be given to the language of the plan. Counsel for the trustee stated at the stockholders' meeting: "The plan makes an offer to you gentlemen; that is all it does." The plan did not attempt to amend the charter of

---

5 In re Worrall, 2 Cir., 79 F.2d 88; In re Marsters, 7 Cir., 101 F.2d 365.

6 Harrison, Trustee, v. Chamberlin, 271 U.S. 191, 46 S.Ct. 467, 70 L.Ed. 897.

South Western Railroad Company.[7] In its opinion approving the plan, the court below said: "If the lessors do not accept the proposal to acquire their lines, they are, on disaffirmance, at liberty to take their properties back." In a letter to the stockholders, the president of the company quoted that part of the court's opinion, and said: "So it is that under the terms of the approved plan, South Western is not required to accept the Trustee's offer of purchase, but may take its property back and operate it, or petition the Court to require the new company to operate South Western's railroads at the risk and for the account of South Western as provided by the Bankruptcy Act."

The judicial process is brigaded with the administrative process in reorganization proceedings under Section 77.[8] The bankruptcy courts and the Interstate Commerce Commission work cooperatively, but this does not mean that the statutory powers of the two departments are blended so that either may exercise the functions of the other. Each exercises its own distinct powers. The court may judicially approve or affirm legislative or executive action by the Commission, but it is only the latter that has full power under Section 5(11) to approve a sale, merger, or consolidation of two railroads with the assent of a majority of the stockholders unless a different vote is required under applicable state law.[9] It is only upon action by the Commission, subject to confirmation by the court, that the reorganized company may carry such transaction into effect without invoking any approval under state authority and without regard to state or federal prohibitions.[10]

In thus transcending all existing legislation, it is the Commission, not the court, in reorganization proceedings that is exercising the delegated legislative power of Congress under the Constitution to regulate commerce. Const. art. 1, § 8, cl. 3. This accounts for the concluding sentence of the paragraph to the effect that no federal corporation is deemed created thereby, but that any power therein granted to any carrier shall be in addition to and in modification of its powers under its corporate charter or under the laws of any state.[11] This provision does not authorize the Commission to compel a railroad corporation, which is not a debtor in reorganization proceedings, to enter into a sale, lease, merger, or consolidation, but authorizes the carrier, with the required assent of its stockholders, to participate in any such transaction with the approval of the Commission. Neither does it authorize the bankruptcy court to compel a lessor not in reorganization to sell its property to the debtor, or to a reorganized company. It has no application to the controversy now being litigated in the state court between the stockholders of South-Western. The suit in the state court was intended to prevent the illegal conveyance of South-Western's interest that was not subject to the lease. Such contingency was within the contemplation of the Commission when the plan was promulgated.

Every plan of reorganization of a railroad, within the meaning of Section 77, is required to provide adequate means for its execution, which may include "the amendment of the charter of the debtor"; but there is no authorization for the court to amend the charter of a creditor or lessor that is not a debtor in reorganization.[12] Upon confirmation of the plan, which is subject to judicial review, the debtor, or any other corporation organized for the purpose of carrying out the plan, shall have full power to put it into effect; and shall do so: the laws of any state to the contrary notwithstanding.[13] Evidently there must be a real or substantial conflict between the plan and any state law before

---

[7] Compare In re New York, New Haven & Hartford R. Co., 2 Cir., 147 F.2d 40. The Central of Georgia here corresponds to New Haven in that case; South-Western corresponds to the Terminal Company.

[8] Palmer v. Massachusetts, 308 U.S. 79, 87, 60 S.Ct. 34, 84 L.Ed. 93, quoted in Smith v. Hoboken R. Co., 328 U.S. 123, 132, 66 S.Ct. 947, 90 L.Ed. 1123,

168 A.L.R. 497; Warren v. Palmer. 310 U.S. 132, 137, 138, 60 S.Ct. 865, 84 L. Ed. 1118.

[9] 49 U.S.C.A. § 5(11).

[10] 11 U.S.C.A. § 205, sub. b authorizes the plan to include "the amendment of the charter of the debtor."

[11] 49 U.S.C.A. § 5(11).

[12] 11 U.S.C.A. § 205, sub. b(5).

[13] 11 U.S.C.A. § 205, sub. f.

the latter may be disregarded. The execution of the plan is "subject to the supervision and control of the judge," Sec. 205, sub.f, supra; and this ought to be assurance enough that state authority will be overridden only to the extent necessary to make the plan effective. We have been cited to no provision in the plan that conflicts with any law of Georgia.

For the bankruptcy court to hold that a majority vote of the stockholders of South-Western would be sufficient, regardless of state law, would amount to amending the plan in the face of the statute which provides that no plan shall be approved or confirmed by the judge "unless the plan shall first have been approved by the Commission and certified to the court." [14] The just-cited statute expressly provides that the Commission may modify any plan which it has approved; and in Chicago, R. I. & P. R. Co. v. Fleming, it was held that the court must approve or disapprove the plan in its entirety; that it alone cannot correct the plan, but may suggest improvements to the Commission.[15]

We think the judgment appealed from should be reversed, the injunction dissolved, and the cause remanded for further proceedings not inconsistent with this opinion. It is so ordered.

Reversed.

HUTCHESON, Circuit Judge (dissenting).

*What is in question for decision here is not, as would appear from the opinion of the majority, a mere question whether in an ordinary bankruptcy proceeding the Court of Bankruptcy could enjoin proceedings in an in personam suit brought in the State Court. It is whether in a railroad reorganization proceeding the Reorganization Court, having issued an injunction against the further prosecution by minority stockholders of a suit to enjoin a leased railroad, whose participation is vital to the reorganization plan, from approving the plan, is powerless to prevent a State District Judge from staying the whole reorganization proceedings by enjoining, in accordance with the prayer of the minority stockholders' petition, the carrying out by the leased railroad of an approved reorganization plan which its officers, its directors, and the majority of its stockholders have accepted and which the Reorganization Court finds has been validly accepted.*

In determining this ultimate question, three primary questions must be answered.

The first one is: After the minority stockholders have been enjoined by the Reorganization Court from proceeding with their injunction suit, can a State Court Judge, of his own motion, issue the injunction as prayed, staying the whole reorganization proceedings as to the leased railroad until the controversy between the minority stockholders and the company over the necessity for unanimous stockholders' consent has been determined in the State Court?

The second one is: If the State Judge does issue such injunction, is the Reorganization Court bound to respect it, or may it, as it did here, determining for itself that under Georgia law the company could act by majority vote of its stockholders, issue its own orders nullifying the State Court injunction and protecting the officers of the leased railroad from the consequences of disobedience of it, thereby preventing the stoppage of the reorganization proceedings and the disrupting and failure of the plan?

The third question is: Was the District Judge right in deciding that unanimous consent of South Western's stockholders was not necessary, that majority consent was sufficient?

The opinion of the majority in stating the case as though the State Court jurisdiction had first attached, the State Court injunction had been first issued, that is as though it were the United States Judge, and not the State Judge, who had been guilty of a gross breach of comity here,[1] and, in failing to state that the State Court injunction

---

[14] See last sentence in 11 U.S.C.A. § 205, sub. d.

[15] 7 Cir., 157 F.2d 241.

[1] Bryan v. Speakman, 5 Cir., 53 F.2d 463 at page 465; Farmers L. & T. Co. v. Lake St., 177 U.S. 51, 20 S.Ct. 564, 44 L.Ed. 667; Harkin v. Brundage, 276 U.S. 36 at page 43, 48 S.Ct. 268, 72 L. Ed. 457; 28 Am.Jur., Injunctions, at Sec. 217 et seq.

was issued to stay action in the Reorganization proceeding after and in defiance of the issuance of the Federal Court injunction, puts the Federal District Judge in the invidious position in which the facts place the State Court Judge. In failing, too, to consider and decide the issue tendered and decided below, whether the judgment of the Reorganization Court, the court which, having jurisdiction of the reorganization res, had complete and exclusive jurisdiction of all questions as to the plan, its acceptance, and its carrying out, was right in declaring that, the majority of its stockholders consenting, the leased railroad had authority to accept under, and to transfer its property in accordance with, the reorganization plan, the opinion of the majority wholly fails to deal with and determine the real, the decisive question in the case.

The facts and issues, that is what really occurred below and what was contended and determined there, are set out with complete accuracy, and the legal conclusions which follow from them are stated with eminent correctness, in the findings of fact and conclusions of law of the District Judge. Their great length precludes me from adopting them, except by reference to the record, as my dissenting opinion. I can and will, however, setting them out in the margin[2] with the greatest possible brev-

2 Findings of Fact:

(1) Appellees are minority stockholders in South Western Railroad Company.

(2) That company is a railroad company originally incorporated under an act of the Assembly of Georgia in 1845, by a charter which makes no specific provision with respect to the sale of the company's railroad properties.

(3) In June, 1869, the company leased its railroads and their appurtenances to the Central Railroad and Banking Company of Georgia for and during its entire existence.

(4) The properties of this company, including the leasehold estate passed at receivership sale to Central of Georgia Railroad Company, the debtor in this case, and in October, 1895, the lease was renewed and modified for the term of 100 years, renewable in like periods for the same term forever, and Central continued to operate the leasehold property until Dec. 5, 1932, when a federal receiver was appointed.

(5) The receiver, adopting the lease, operated under it until June, 1940, when Central filed this railroad reorganization proceeding, and the trustees appointed in it took over.

(6) A plan of reorganization of the Central, which the Commission had found to be "compatible with the public interest", was promulgated by it, was approved by the court on June 25, 1946, and no appeal was taken from the order of approval.

(7) This plan allotting to South Western, if it accepted under it, bonds of the reorganized company, provided that if South Western did not accept under the plan, its lease should be disaffirmed as of such time at or prior to the consummation of the plan as the court may direct.

(8) South Western appeared specially in the reorganization proceedings: (1) to ask that its lease be adopted as part of the reorganization plan; (2) to contest before the Commission and the Court the allotment to it under the plan as proposed and finally approved; (3) to file (a) a claim for equipment which had not yet been determined, and (b) a petition for declaratory judgment as to its rights in the event its lease was rejected. This the court refused on the ground of the Commission's exclusive jurisdiction of the matter.

(9) South Western is solvent, no bankruptcy proceedings have been instituted against it, no contention has been made at any time that South Western could be compelled to accept the plan, and no effort has been made to so compel it.

(10) On Feb. 11, 1947, the Commission submitted the plan to the creditors and leased lines, including South Western, for their acceptance or refusal on or before midnight, March 28, 1947.

(11) On March 13, 1947, the directors of South Western met and resolved that the plan be accepted subject to the assent of a majority of the stockholders and that when this had been given, "the officers of the company be, and they are hereby, authorized and directed to carry out the plan as authorized by Sec. 94-328 Code of Georgia Annotated, of 1933."

(12) On March 25, 1947, Benton and another, minority stockholders of South Western, filed in the State Court of Bibb County a bill in equity against South Western and its directors, alleging that it was without power to accept the reorganization plan and carry it out by sale of its properties without the consent of all the stockholders, and praying that the stockholders be enjoined from meeting and accepting the plan, and if the stockholders be not restrained, the officers and directors of the company be

886

ity, rely heavily on them, in pointing out the graceless enormity, the complete absence of power, of the state district judge in attempting to stay the reorganization proceedings, and the nature and scope of the error of the majority opinion in giving aid and comfort to his obstructive acts. This error, which, as excerpts in the margin from the opinion[3] show, proceeds from the view that the jurisdiction possessed and

enjoined "from filing with the District Court or the Commission" any acceptance of the plan and that they "be enjoined from doing and performing any act in behalf of South Western Railroad Company which might tend to consummate the plan of reorganization of control of Georgia Railway with respect to the acquisition of the properties of the South Western Railroad Co."

(13) A rule having issued to show cause and hearings having been had on March 26 and 27, the State Court did not enjoin the meeting of the stockholders or their acceptance of the plan but reserved his decision on all the matters argued.

(14) On March 28, the stockholders met and by a two-thirds majority accepted the plan, and on that same day South Western in accordance with the resolution of its directors and stockholders mailed to the Commission its ballot accepting the plan.

(15) On April 18, 1947, no further action having been taken in the State Court suit, the trustee filed his bill in the Reorganization Court, calling to the attention of that court the pendency and nature of the Benton suit and asking that its further prosecution be enjoined as an interference with the reorganization proceedings, whereupon the district judge set the matter down, issuing the temporary injunction as prayed.

(16) On April 24, 1947, the judge of the State Court, reciting that the federal court had issued an injunction against the further prosecution of the suit, and, purporting to be acting on his own motion, issued a sweeping injunction against the defendants in the State Court suit based on his opinion that South Western had no charter power to sell its railroad without the unanimous consent of its stockholders. This injunction, in most sweeping terms, stayed South Western "from carrying into effect any provision for the sale or lease of the railroad properties of the defendant railroad company pursuant to any acceptance of any plan or any such sale or lease not authorized by a unanimous vote of the stockholders defendant company", and following precisely the prayer of Benton's petition, further enjoined the officers and directors from filing with the United States District Court, or the Interstate Commerce Commission, any acceptance of such plan, from selling to the reorganized company or to anyone else the properties of the railroad, and finally, *it provided "specifically that such officers and directors be, and they are hereby restrained and enjoined from doing and performing any act in behalf of the defendant railroad company which might tend to consummate the plan of the Central of Georgia Railroad Company with respect to the acquisition by that company of the properties of the South Western Railroad".*

(17) Whereupon, the trustee amended his petition to bring this injunction to the attention of the Reorganization Court and to present for adjudication by the Reorganization Court the question whether, under the laws of Georgia and the circumstances of this case, unanimous consent of the stockholders of South Western is a condition precedent to the acceptance of the plan by that company and its consummation by the conveyance of its property to the reorganized company. There was a prayer that the order of the Superior Court of Bibb County be annulled and declared void and that when the plan is confirmed by the court such orders may be passed as will make effective South Western's acceptance and consummation.

(18) On May 26, 1947, the case was heard, the right of South Western to agree to the plan and sell its properties without the unanimous consent of its stockholders was declared, and the injunction theretofore issued was made permanent. The temporary injunction issued by the judge of the State Court was declared null and void as in excess of that Court's jurisdiction and an invasion of the jurisdiction of the Reorganization Court.

3 Contrast the statement of the majority opinion, that "Section 77 of the Act, and kindred legislation, did not alter, lessen, or abolish the several distinct classes of jurisdiction exercised by the bankruptcy court. * * * The exclusive jurisdiction of the district court in reorganization proceedings is that which bankruptcy courts have customarily possessed. In entering the judgment in this case, annulling and staying proceedings in the state court, the bankruptcy court undertook in a summary proceeding to exercise exclusive jurisdiction in rem as to property that the trustee did not own but was seeking to acquire."

exercised here is no more and no less than would be exercised in an ordinary bankruptcy proceeding, and that the *res* of which the Reorganization Court is said to be possessed and to have jurisdiction is merely physical properties of the debtor instead of, as is the law, *the res being the* *reorganization proceeding, including its controversies and questions and the plan it was instituted to bring about.*

As the conclusions of law of the District Judge, excerpts from which I have set out in the margin,[4] show, he saw with great clearness what the majority opinion not on-

---

[4] These are in abbreviated form:

(1) South Western is a creditor of Central, and is a party to the reorganization proceeding and to the plan for all purposes connected with it.

(2) The purpose, and, if the state court injunction had been allowed to stand, the effect of the suit of Benton in the State Court, was to completely disrupt the reorganization proceeding by preventing the consummation of the plan.

(3) "The judicial process in bankruptcy proceedings under § 77 is, as it were, brigaded with the administrative process of the Commission". Palmer v. Mass., 308 U.S. 79, 87, 60 S.Ct. 34, 38, 84 L.Ed. 93, quoted in Smith v. Hoboken R. R. Warehouse & S. S. Connecting Co., 328 U.S. 123, 132, 66 S.Ct. 947, 952, 90 L.Ed. 1123, 168 A.L.R. 497. "The judicial functions of the bankruptcy court and the administrative functions of the Commission work cooperatively in reorganization." Warren v. Palmer, 310 U.S. 132, 137, 138, 60 S.Ct. 865, 867, 84 L.Ed. 1118.

(4) The acceptance of the plan by South Western involves its merger or consolidation and conveyance of its properties to the reorganized Company. The plan expressly provides that this shall be done if the plan is accepted by South Western.

(5) The Bankruptcy Court and the Commission under the Federal Statutes have exclusive control of the matter of the merger or consolidation of South Western with the reorganized Company and the sale of the railroads of South Western to the reorganized Company. The proposal is made in the reorganization proceeding, and the acceptance or rejection must be made in the reorganization proceeding. What vote of stockholders is sufficient to authorize the South Western to act, the validity of its acceptance, and the validity of the acceptance, and the validity of the conveyance to be made in consummation of the Plan are all questions for the Bankruptcy Court and the Commission.

"We hold that this Court as a Court of Bankruptcy, in connection with the powers conferred upon the Interstate Commerce Commission, has sole and exclusive jurisdiction in this matter, and that the attempt of the Plaintiff in the State Court suit to present the consummation of the Plan as it affects South Western, is an interference with the exclusive and prior jurisdiction of this Court."

(6) "The Court, having exclusive jurisdiction of the subject matter, has power to issue an injunction to prevent defeat or impairment of its jurisdiction, and this power is inherent in a Court of Bankruptcy, as it is in a Court of Equity. Continental Bank & Tr. Co. v. Rock Island R. Co., 294 U.S. 648, 675, 55 S.Ct. 595, 79 L.Ed. 1110. Ex Parte Baldwin, 291 U.S. 610, 615, 54 S.Ct. 551, 78 L.Ed. 1020. Thompson, Tr., v. Magnolia Petroleum Co., 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876."

(7) "In this matter the State Court acted in excess of its jurisdiction, and under the authorities such acts are void and can be annulled by the decree of the Court which has exclusive or prior jurisdiction. 21 C.J.S. [Courts, §§ 114–116], pp. 176, 177, 178; French v. Hay, 22 Wall. 250, 22 L.Ed. 857; Kalb v. Feuerstein, 308 U.S. 433, 60 S.Ct. 343, 84 L.Ed. 370; United States v. Walker, 109 U.S. 258, 3 S.Ct. 277, 27 L.Ed. 927 and cases cited."

(8) "South Western Railroad Company, in holding the stockholders meeting, was acting under Code Sections 94-328 and 94-329 of the Code of Georgia of 1933. * * * These Code Sections do not purport to amend any charter of any Corporation. They are laws of general operation and any corporation which comes within its terms may avail itself of the Code Sections. It is not necessary for the South Western Railroad Company by a vote of its stockholders to accept these Code Sections as a part of its charter. These Code Sections do not in any sense impair any obligation of the contract as between the stockholders themselves. In the exigencies stated in the Code Sections the Corporation may sell its property on the vote of a majority of its stockholders. This does not impair the contract among the stockholders. It is a safety valve for them, in case the corporation finds itself in the predicament stated in the Code Sections. Atlanta Loan & Savings Co. v. Norton, 149 Ga. 805, 812, 102 S.E. 536."

ly failed to see but denied (note 3) that "A proceeding under section 77 is not an ordinary proceeding in bankruptcy. *It is a special proceeding which seeks only to bring about a reorganization, if a satisfactory plan to that end can be devised and to prevent the attainment of that object is to defeat the very end the accomplishment of which was the sole aim of the section, and thereby to render its provisions futile."* (Emphasis supplied.) Continental Illinois Nat. Bank & Trust Co. v. Chicago Rock Island & Pac. Ry. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110.

He saw, with complete clarity too, that under the controlling decisions of the Supreme Court of the United States,[5] the *res* of which the Reorganization Court has exclusive jurisdiction is not merely, or even mainly, the physical properties of the debtor railroad. It is the *proceeding for its reorganization,* including all claims, issues and controversies affecting or relating to *the plan of reorganization, the prime res in the proceeding,* its formulation, acceptance and carrying out. Because he saw this so clearly he saw that the control, the jurisdiction, which as judge of the Reorganization Court he had and must exercise, was a jurisdiction absolutely exclusive and complete over all questions and controversies, the decision of which would or might affect, delay, consummate, or interfere with the consummation of, *the plan.* A few quotations from the controlling authorities will, I think, make this completely clear.

In Continental Illinois Nat. Bank & Trust Co. v. Chicago, Rock Island & Pac. Ry. Co., supra, at page 671 of 294 U.S. at page 604 of 55 S.Ct., the court said: "Section 77 ad-

vances another step in the direction of liberalizing the law on the subject of bankruptcies. Railway corporations had been definitely excluded from the operation of the law in 1910 * * * probably because such corporations could not be liquidated in the ordinary way or by a distribution of assets. A railway is a unit; it can not be divided up and disposed of piecemeal like a stock of goods. It must be sold, if sold at all, as a unit and as a going concern. Its activities cannot be halted because its continuous, uninterrupted operation is necessary in the public interest; and, for the preservation of that interest, as well as for the protection of the various private interests involved, reorganization was evidently regarded as the most feasible solution whenever the corporation had become 'insolvent or unable to meet its debts as they mature.' "

Then posing the question whether the bankruptcy court had authority to enjoin the sale of collateral, held under pledge by banks and the Reconstruction Finance Corporation, "if a sale would so hinder, obstruct and delay the preparation and consummation of a plan of reorganization as properly to prevent it", the court answered the question in the affirmative, saying, at page 676, of 294 U.S., at page 606, of 55 S.Ct.: "It may be that in an ordinary bankruptcy proceeding the issue of an injunction in the circumstances here presented would not be sustained * * *. But a proceeding under section 77 is not an ordinary proceeding in bankruptcy."

In Gardner v. New Jersey, 329 U.S. 565, 67 S.Ct. 467, a railroad reorganization proceeding, the court declared that the reorgan-

"There is no law of the State of Georgia which requires unanimous consent of stockholders to enable a railroad company to sell its railroad. There is no law and no decision of the Courts of Georgia which hold that under no circumstances can a railroad or other corporation transfer all of its property without the unanimous consent of its stockholders."

"The Code Sections are consent on the part of the State that under the circumstances stated in the Code Sections the Railroad Company may sell all of its railroad. So that with this consent on the part of the State, this quasi public corporation stands in the same position so far as the sale of its property is con-

cerned, as would any private corporation."

(9) "In the exigencies which confront the South Western, it clearly has power to sell its property to the newly Reorganized Company without the unanimous consent of its stockholders."

[5] Continental Illinois Nat. Bank & Trust Co. v. Chicago, Rock Island & Pac. Ry. Co., 294 U.S. 648, 55 S.Ct. 595, 79 L.Ed. 1110; Thompson v. Texas Mexican R. Co., 328 U.S. 134, 66 S.Ct. 937, 90 L.Ed. 1132; Smith v. Hoboken R. Co., 328 U.S. 123, 66 S.Ct. 947, 90 L.Ed. 1123, 168 A.L.R. 497; and Gardner v. New Jersey, 329 U.S. 565, 67 S.Ct. 467.

ization court had jurisdiction over all property of the debtor including that on which the State asserted a lien and could adjudicate all questions and issues raised by objections to the State's claim, including the validity and priority of liens whether or not claimed by the State.

These decisions, bottomed as they are upon the view that the Reorganization Court has sweeping and all inclusive jurisdiction over all claims and controversies which arise out of or attend upon the formulation of a plan and its bringing to fruition, leave in no doubt whatever that the State judge was the intruder without right in the contest of jurisdiction below.

"It would fly in the teeth of § 77, sub. a, which grants the reorganization court 'Exclusive jurisdiction of the debtor and its property wherever located.' That jurisdiction is not limited to the prevention of interference with the use of the property by the trustee; it 'extends also to the adjudication of questions respecting the title'. Ex parte Baldwin, 291 U.S. 610, 616, 54 S. Ct. 551, 554, 78 L.Ed. 1020; Thompson v. Texas Mexican R. Co., 328 U S. 134, 140, 66 S.Ct. 937, 942 [90 L.Ed. 1132]. It is the exclusive jurisdiction of the reorganization court which gives it power to preserve the railway as a unit and as a going concern and to prevent it from being divided up and dismembered piecemeal. Only in that way can continuous operation of the road be assured and a plan of reorganization be effected which not only safeguards the interests of the various claimants but is also compatible with the public interest. * * *

"When Sec. 77 is read against this historical background and in light of practical requirements, we cannot conceive that Congress gave the reorganization court power less replete than the sweeping language of § 77 suggests." Gardner v. New Jersey, 329 U.S. at page 577 67 S.Ct. at page 473.

The majority opinion has not decided this case in the light of these broad and catholic views. It has treated it as an ordinary proceeding in an ordinary bankruptcy, and has pitched its decision of it on the small and meager, the wholly irrelevant, question of whether "the bankruptcy court had jurisdiction in rem of property the conveyance of which had been enjoined by the state court", and its answer, that since South Western was not in bankruptcy, the court did not have. The question had no place in this proceeding. The answer to it, reversing the judgment in this case, was wrong.

Perhaps the basic error of the majority opinion, the error from which all other errors flow, is its holding that the suit in the State Court, which the judgment appealed from enjoined, was a mere proceeding in personam. It was in fact in no sense such. It was a proceeding by use of the injunctive process of the State Court to bring to a complete stop all the proceedings in the Court of Reorganization and thus prevent the consummation of the plan. To prevent this direct and positive interference by force, the force of a state court injunction, with the whole in rem proceeding, the reorganization itself, the federal court was compelled to exercise its exclusive jurisdiction to stay the disruptive State Court proceedings and, taking cognizance of the controversy as to whether South Western could accept the plan and carry it out, determine that controversy for itself. It did determine it favorably to the acceptance of the plan. That determination was right, and the judgment should have been affirmed. I dissent from its reversal.