# United States Court of Appeals

## For the First Circuit

No. 04-1800

JAMES E. HOWARD, Chapter 11 Trustee of Bangor and Aroostook
Railroad Company and Van Buren Bridge Company,

Petitioner,

v.

SURFACE TRANSPORTATION BOARD and UNITED STATES OF AMERICA,

Respondents.

PETITION FOR REVIEW FROM THE SURFACE
TRANSPORTATION BOARD

No.  04-1819

JAMES E. HOWARD, Chapter 11 Trustee of Bangor and Aroostook
Railroad Company and Van Buren Bridge Company,

Plaintiff, Appellant,

v.

CANADIAN NATIONAL RAILWAY COMPANY and WATERLOO RAILWAY COMPANY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. George Z. Singal, U.S. District Judge]

Before
Torruella, Circuit Judge,
Coffin, Senior Circuit Judge,
Lynch, Circuit Judge.

Thomas M. Reiter, with whom Rory FitzPatrick, Steven P. Wright, Kirkpatrick & Lockhart, LLP, Roger A. Clement, Jr., Andrew R. Sarapas, and Verrill & Dana, LLP, were on brief, for appellant and petitioner.

William C. Sippel, with whom Thomas J. Litwiler, Fletcher & Sippel, LLC, George J. Marcus, and Marcus, Clegg & Mistretta, P.A., were on brief, for appellees Canadian National Railway Company and Waterloo Railway Company.

Alice C. Saylor, Attorney, Surface Transportation Board, Ellen D. Hanson, General Counsel, Craig M. Keats, Deputy General Counsel, R. Hewitt Pate, Assistant Attorney General, Department of Justice, Makan Delrahim, Deputy Assistant Attorney General, Robert B. Nicholson, Attorney, and John P. Fonte, Attorney, were on brief for respondents Surface Transportation Board and United States of America.

Charles A. Spitulnik, Alex Menendez, and McLeod, Watkinson & Miller were on brief for Fraser Papers Limited, intervenor.

---

November 24, 2004

---

**LYNCH, <u>Circuit Judge</u>**.  These consolidated appeals present the issue of law of whether the term "abandonment" in section 1170 of the Bankruptcy Code gives the bankruptcy courts the power to adversely abandon a non-debtor railroad's easement and trackage rights over rail lines owned by the debtor at the time of the bankruptcy.  This appears to be an issue of first impression in the courts of appeals.

Section 1170, which resulted from the 1978 Bankruptcy Code Amendments, is an exception to the normal rule that only the Surface Transportation Board (STB), the successor to the earlier Interstate Commerce Commission (ICC), has jurisdiction to authorize the abandonment of rail lines or the discontinuance of operations over any part of a rail line.  <u>See</u> 49 U.S.C. § 10903.  In the section 1170 abandonment process, the STB still plays a role, but it is an advisory one.  <u>See</u> 11 U.S.C. § 1170 (b),(c).  Outside of the context of a bankrupt railroad, in order to achieve an abandonment or a discontinuance, rail carriers must apply to the STB for permission.

A discussion of some of the parlance of federal railroad regulation is helpful.  Generally, when a rail carrier or a third party wishes to "abandon" its own rail line, it must seek permission from the STB.  49 U.S.C. § 10903.  If a rail carrier is operating rail transportation over its own line or over the line of another by the grant of independent trackage rights, it must seek

permission from the STB to "discontinue" the service. Id. The STB's authority and the standards governing its decisions are the same regardless of whether it is granting an abandonment or a discontinuance. See Id. § 10903(d).

Under 49 U.S.C. § 10903, this application can be brought to the STB by the rail carrier itself or, in a more unusual circumstance, by a third party. See Consolidated Rail Corp. v. I.C.C., 29 F.3d 706, 708-09 (D.C. Cir. 1994). If the rail carrier applies to abandon or discontinue its own lines or service, the application is for an "abandonment" or "discontinuance" (what we will call a "direct" abandonment or discontinuance for purposes of clarity). By contrast, if a third party applies to abandon or discontinue the lines or services of another rail carrier in an STB proceeding, it is called an "adverse" abandonment or discontinuance. Id. The STB can grant an adverse abandonment or discontinuance on a third party's petition even if the owner of the line or the trackage rights objects. The text of section 10903 itself does not distinguish between adverse and direct abandonments, but the case law makes it clear that the STB has authority to hear both types of applications. Thompson v. Texas Mexican Ry. Co., 328 U.S. 134, 145 (1946)("There is no requirement . . . that the application [for abandonment to the STB] be made by the carrier whose operations are sought to be abandoned.").

Here the debtor railroad through its trustee seeks to adversely abandon not its own interest, but the interests of a third party in an easement and trackage rights over lines once owned by the debtor at the time of bankruptcy. The rub is that it seeks to do so in the bankruptcy court, not before the STB. The district court held that the statutory language in section 1170, giving the bankruptcy court authority over abandonments of rail lines, does not include the authority to grant adverse abandonments of a non-debtor's trackage or other rights. The plaintiff/trustee in bankruptcy appeals this decision.

We affirm the district court's dismissal of Count III of the trustee's complaint. In doing so, we hold that the bankruptcy court does not have the authority under section 1170 to adversely abandon the lines or trackage rights of a non-debtor, on the petition of a debtor railroad who owned those lines at the time of bankruptcy. Such authority lies, instead, within the jurisdiction of the STB under 49 U.S.C. § 10903. We also affirm the decision of the STB under 49 U.S.C. § 10903 denying permission for the relief the trustee seeks.

**I.**

In March 2001, Bangor & Aroostook Railroad Company (BAR) and Canadian National (CN) (which includes Canadian National Railway Company (CNR) and its subsidiary, Waterloo Railway Company (Waterloo)) entered into a series of pre-bankruptcy agreements

-5-

involving the movement of rail cars over the Madawaska rail line. At the time of the agreements, BAR and its wholly owned subsidiary, Van Buren Bridge Company (VBBC), owned this line. The Madawaska line runs from the Fraser paper mill in Madawaska, Maine, to an interchange with a CN line at St. Leonard, New Brunswick, Canada.

In exchange for the rights granted under the agreements, CN paid BAR five million dollars in cash. The first agreement between the two parties was a Junction Settlement Agreement, under which BAR agreed to move CN's railcars over BAR's Madawaska line, between the connection with CN's rail lines at St. Leonard and the Fraser paper mill.[1] CN agreed to pay BAR a specified per-car price for performing these haulage services and has done so. The parties also entered into a Trackage Rights Agreement. Under this agreement, CNR acquired limited local trackage rights which allowed it to run its own trains over the Madawaska line to the Fraser paper mill. Finally, in a third agreement BAR granted Waterloo a non-exclusive freight easement, under which Waterloo could also operate its trains over the line. It is the last two agreements which the trustee seeks to undo here.

The STB approved the Trackage Rights and Easement Agreements on an application by CN on March 21, 2001. Since this time, CN has not itself used its own trackage rights or the

---

[1] The parties and the STB agree that the STB does not have regulatory authority over this agreement.

-6-

easement; instead it has relied on the haulage agreement to service the Fraser mill, and pays BAR a fee for its services.

On August 15, 2001, certain creditors filed an involuntary Chapter 11 bankruptcy proceeding against BAR. In December 2001, the bankruptcy court entered an order for relief under Chapter 11. It appointed James Howard as trustee in bankruptcy.[2] As part of the bankruptcy plan, Montreal, Maine & Atlantic Railway LTD (MM&A) acquired the Madawaska line and other BAR rail assets from the trustee in January 2003. The effect of the agreement between MM&A and BAR is that the trustee no longer has ownership rights as to the line.

There was also what we suspect was an unusual arrangement in a part of the acquisition agreement: MM&A agreed to pay BAR five million dollars if BAR successfully removed CN from the Madawaska line prior to January 1, 2005. The trustee's sole remaining interest in the line is the potential five million dollar payout from MM&A. As a result, BAR had a financial incentive to attempt to oust CN from the Madawaska line, although it no longer owns the line. CN, of course, had no interest in abandoning any of its rights in that line (which it recently had paid five million dollars to BAR to acquire).

---

[2] In May 2002, BAR's subsidiary, Van Buren Bridge Company (VBBC), filed for voluntary bankruptcy under Chapter 11 of the Bankruptcy Code. The court appointed Howard as the trustee for its proceedings as well.

In March 2002, the trustee filed a motion in bankruptcy court to reject the Junction Settlement Agreement, the Trackage Rights Agreement, and the easement as executory contracts under 11 U.S.C. § 365. The trustee initially acknowledged that the elimination of CN's trackage rights and easement was subject to the exclusive jurisdiction of the STB, but later changed his position on this issue.

In May 2002, the bankruptcy court stayed the proceedings pending action by the STB on appropriate requests for relief by the trustee to the STB. With the STB, the trustee filed a petition to "revoke" CN's trackage and easement rights, pursuant to 49 U.S.C. § 10502(d). This effort was unsuccessful, and the STB explained that because CN's trackage and easement rights were "authorized by the agency, [they] will remain in effect until discontinuance authority is granted [under 49 U.S.C. § 10903]." Canadian Nat'l Ry. Co., STB Finance Docket No. 34014, 2002 WL 1365812 at *6 (STB June 25, 2002). Basically, the STB said the trustee had used the wrong procedural vehicle. The STB also said that even if it were to construe a petition to revoke as a request for adverse discontinuance under 49 U.S.C. § 10903 (the correct vehicle), there was no basis in the record to grant such a request. Id. at *7.

After the STB's rejection of the trustee's petition to revoke, the bankruptcy court extended the stay of the proceedings,

-8-

pending the trustee's completion of the adverse abandonment proceedings before the STB under 49 U.S.C. § 10903.

The trustee then switched tracks (metaphorically). On April 16, 2003, the trustee asserted for the first time in bankruptcy court that the STB did not have final authority over the forced abandonment of CN's rights, and that the bankruptcy court could unilaterally oust CN from the line pursuant to its authority under 11 U.S.C. § 1170. It is apparent that the trustee calculated, rightly or wrongly, that he was more likely to get the five million dollar payment from MM&A by being in bankruptcy court on the adverse abandonment issue, rather than before the STB.

On May 7, 2003, the bankruptcy court issued an oral order that lifted the stay on the proceedings and converted the matter to an adversary proceeding. The trustee filed his complaint in the adversary proceedings against CN on June 17, 2003. Count III of the complaint sought an order from the bankruptcy court authorizing the discontinuance of CN's trackage rights and the abandonment of CN's easement.

After a telephone conference with the parties, the bankruptcy court issued a procedural order dated June 19, 2003. The court stated that it was uncertain whether BAR's efforts "not to discontinue its own existing service over a portion of a rail line, but . . . to 'adversely abandon' [CN's] rights to use [BAR's] tracks" were within the scope of a bankruptcy court's power under

11 U.S.C. § 1170. On June 25, 2003, CN filed an unopposed motion to withdraw reference of the adversary proceeding to the bankruptcy court. The motion was granted on June 30, 2003, and all further proceedings took place in the federal district court of Maine. On July 22, 2003, CN moved to dismiss the trustee's complaint, arguing that the bankruptcy court had no authority to issue adverse abandonments of a non-debtor's lines under 11 U.S.C. § 1170.

The magistrate judge issued a recommended decision that section 1170 of the Bankruptcy Code did not apply to the trustee's efforts to remove CN from the Madawaska Line, and that the relief sought by the trustee could only be obtained if the STB granted the adverse abandonment pursuant to section 10903. The decision concluded that the plain language of the statute did not determine its meaning and that recourse to the legislative history was appropriate. The magistrate judge concluded that the legislative history made it "reasonably clear that in enacting section 1170 Congress was concerned with streamlining and accelerating the process of abandonment or discontinuance of a cash-strapped debtor's own rail lines," not the lines of non-debtors. This interpretation was further supported by the STB's decision in Chicago, Rock Island & Pac. R.R. Co., 363 I.C.C. 150 (1980), which the magistrate judge found "reasonably . . . construed sections 10903 and 1170, in tandem, to preserve [the STB's] power . . . to adjudicate an adverse-abandonment petition filed by a debtor

railroad." Finally, the magistrate judge concluded that the language used by Congress in enacting different legislation in 1979 which applied section 1170 to the then-pending Milwaukee Railroad restructuring supported an interpretation limiting the abandonment authority of the bankruptcy court to the debtor's own lines. In this legislation, Congress stated, "the bankruptcy court may authorize the abandonment of lines of the Milwaukee Railroad pursuant to section 1170 of Title 11." 45 U.S.C. § 904(a)(1).[3]

On November 18, 2003, the district court agreed with the decision of the magistrate judge and adopted its reasoning. The district court's order granted CN's motion to dismiss Count III of the complaint under Rule 12(b)(6), Fed. R. Civ. P. It also deferred adjudication of the motion as it pertained to the remaining counts of the trustee's complaint pending the STB's disposition on the trustee's adverse discontinuance application.

In the meantime, the trustee had filed on October 6, 2003, an application with the STB for the abandonment of CN's trackage rights and easement over the Madawaska line. This was essentially an application for an adverse abandonment under section 10903; but the trustee noted that his position was that if the final authority was in the bankruptcy court under section 1170, then the STB's opinion should be viewed only as an advisory opinion

---

[3] Unlike the district court, we do not rely on the later enacted 45 U.S.C. § 904(a)(1) in determining the meaning of 11 U.S.C. § 1170.

-11-

as permitted by section 1170. From the perspective of the STB, whether it is acting in an advisory capacity or as the final authority, the substantive standards for the two determinations are the same. Treating it as a matter under section 10903, the STB on April 30, 2004, denied the application because it found the trustee had failed to meet its burden of showing that the "public convenience and necessity" required the ouster of CN from the Madawaska line. Waterloo Ry. Co., STB Docket No. AB-124, 2004 WL 941227, at *1 (STB April 30, 2004).

The STB determined that the public is best served by allowing CN to remain on the Madawaska line. In coming to its conclusion, the STB balanced the competing benefits and burdens on all interested parties. One such interested party was Fraser Papers. Fraser Papers had intervened in and opposed the trustee's abandonment action before the STB. Fraser stressed that in the past its mill at Madawaska, Maine, had been served only by BAR and that in late 2000 it had expressed strong concern to CN that BAR's financial condition[4] was deteriorating and that a consequent loss of rail service would likely result in a shutdown of the Madawaska mill. Fraser said that the Madawaska mill is highly interdependent

_____

[4] Fraser points out that even if BAR ousts CN and brings in more revenue to MM&A, somehow MM&A has to finance the five million dollar payment to BAR. That need to finance could weaken MM&A's financial condition, raising the prospect that MM&A would suffer the same fate as BAR and that the Madawaska mill would be left with no rail service.

-12-

with another mill in Edmundston, New Brunswick, Canada.  If the Madawaska mill were shut down, the Edmundston mill would be shut down as well, depriving 1600 employees of work and depriving Fraser of 8.5 million dollars in revenue per week.  The STB agreed that the loss of competitive rail service would be a detriment to Fraser and perhaps would impact the economic development and well-being of communities and rural areas near the mill.  Id. at *4-*5, *8.

Although it was not required by statute to do so, the STB also considered the needs of BAR's creditors, the benefits to the bankrupt estate, and the fairness of the arrangement to the parties involved.  Id. at *5-*8, *8-*9.  The STB found that the trackage rights obligation between CN and BAR (and now honored by MM&A) in March 2001 was fair and entered into at arm's length.  It also determined that the retention of CN on the Madawaska line would not affect MM&A's survival or cause the abandonment of other MM&A line segments.  The Board ultimately determined that the interests of the bankrupt estate did not "justify stripping CN of its right to provide competitive rail service to Fraser or depriving Fraser of its right to receive that service."  Id. at *9.

The STB rejected challenges made to the standing of the trustee in light of the sale of the line by BAR to MM&A.  Id. at *3.[5]  No party challenges that determination on appeal.  After the

---

[5] The bankruptcy court does not specifically address the issue of standing.  The bankruptcy court commented that this was essentially a "transportation dispute" between CN and MM&A, but

-13-

STB issued its decision, the trustee filed in court a consented to motion for the voluntary dismissal of the remaining counts of the trustee's complaint without prejudice, pursuant to Rule 41(a)(2), Fed. R. Civ. P. On June 3, 2004, the district court granted the voluntary dismissal without prejudice as to the remaining counts of the trustee's complaint and entered a separate and final judgment in CN's favor, pursuant to Rule 58(a), Fed. R. Civ. P. The trustee timely appealed the dismissal of Count III to this Court in No. 04-1819. Fraser has intervened and has filed a brief in this court in support of affirmance of the district court's opinion.

In No. 04-1800, the trustee also timely petitioned this court for review of the STB's order denying the trustee's application for discontinuance and abandonment. See 28 U.S.C. § 2321. Both Fraser and CN have intervened in this matter. The trustee argues that the STB had no jurisdiction to issue a binding decision under 49 U.S.C. § 10903 and that it could only issue an advisory report under 11 U.S.C. § 1170. The trustee does not attack the merits of the STB's decision. In response, the STB has also filed a brief, pointing out that it had been made a party only

recognized the trustee's desire to effect a plan and the importance of the five million dollars to the estate. Also, the bankruptcy court included, upon the request of CN, a provision in its October 9, 2002 order approving the sale of BAR's estate assets to MM&A that expressly reserved "all rights and obligations of the parties to the CN Junction Settlement Agreement, the CN Trackage Rights Agreement, and the Waterloo Easement . . . subject to further ruling by this Court or any other court of competent jurisdiction."

-14-

in appeal No. 04-1800, and that the issue of whether section 1170 applied was an issue only in appeal No. 04-1819.  The STB says that whatever the outcome of that question, the trustee has waived any argument addressed to the merits of the STB's determination.  The STB asks that we affirm the Board's decision.

## II.

Review of the dismissal of a claim under Rule 12(b)(6) for failure to state a claim upon which relief can be granted is de novo.  Martin v. Applied Cellular Tech., Inc., 284 F.3d 1, 5 (1st Cir. 2002).

The trustee makes an argument based on the "plain meaning" of the statutory text of 11 U.S.C. § 1170.  The relevant parts of section 1170 provide as follows:

> (a) The court, after notice and a hearing, may authorize the abandonment of all or a portion of a railroad line if such abandonment is --
>         (1)(A) in the best interest of the estate; or
>         (B) essential to the formulation of a plan; and
>         (2) consistent with the public interest.
> (b)If . . . such abandonment would require approval by the [STB] under law of the United States, the trustee shall initiate an appropriate application for such abandonment with the [STB].  The court may fix a time within which the [STB] shall report to the court on such application.
> (c) After the court receives the report of the [STB], or the expiration of the time fixed under subsection (b) of this section, whichever occurs first, the court may authorize such abandonment, after notice to the [STB], the Secretary of Transportation, the trustee, any party in interest that has requested notice, any affected shipper or community, and any other entity prescribed by the court, and a hearing.

-15-

11 U.S.C. § 1170. The trustee argues that section 1170 is not limited to abandonment of the debtor's own operations and that the phrase "all or a portion of a rail line" shows that the term "abandonment" is not so limited.[6]

In fact, BAR's argument does not rely on the plain text of section 1170, but requires reference to a prior judicial construction of section 10903. The relevant parts of that section, in turn, provide:

> (d) A rail carrier providing transportation subject to the jurisdiction of the Board under this part may--
>    (1) abandon any part of its railroad lines; or
>    (2) discontinue the operation of all rail transportation over any part of its railroad lines;
> only if the Board finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance.

49 U.S.C. § 10903. BAR's argument is that the term "abandonment" as used in section 10903 has been construed by both the agency and the courts to include adverse abandonment. See Consolidated Rail Corp., 29 F.3d at 708-09. From this, the trustee argues that

---

[6] The language of section 1170 refers only to "abandonments." As CN points out, an "abandonment" is distinct from a "discontinuance." See 49 U.S.C. § 10903(d). Despite this, the legislative history states that "[t]he subchapter provides that the court rather than the [STB] has the authority to authorize abandonments or discontinuances of rail service." S. Rep. No. 95-989, at 12 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5798 (emphasis added). This case involves the abandonment of the Waterloo easement and the discontinuance of CN's trackage agreement. Both parties have taken the term "abandonment" in section 1170 to cover both abandonment and discontinuance. We pursue it no further.

-16-

Congress was aware of the construction of "abandonment" in section 10903 and is presumed to have adopted that construction in section 1170.

The trustee also argues that his reading of section 1170 is sensible and would not have improper effects on third parties. The trustee says first that concerns about non-debtor railroads are irrelevant because any consequences to them are exactly what Congress intended, as the plain text demonstrates. Further, the trustee points out that section 1170 requires the court to consult

the STB and consider the public interest.[7]  That is enough, the

trustee says, to allay any untoward effects on third parties.[8]

Indeed the trustee attacks the district court ruling

itself as leading to untoward results.  The trustee argues, for

example, that if the debtor wants to abandon its own underlying

---

[7] The standards used by the bankruptcy court to determine whether to permit abandonment under section 1170 are not identical to those used by the STB under section 10903.  The court must find that the abandonment is (1) "in the best interest of the estate" or "essential to the formulation of a plan" and (2) "consistent with the public interest."  11 U.S.C. § 1170(a)(1)-(2); see also 11 U.S.C. § 1165 ("In applying section[] . . . 1170 . . . the court and the trustee shall consider the public interest in addition to the interests of the debtor, creditors, and equity security holders.").  The STB's advisory report is supposed to represent the public interest while the trustee and various creditors represent what is in the best interest of the debtor and its creditors.  S. Rep. No. 95-989, at 12 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5798.  "The court will balance the various interests and make an appropriate decision."  H. Rep. No. 95-595, at 424 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6380.
The STB may permit abandonment of rail lines or discontinuance of operations "only if the [STB] finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance."  49 U.S.C. § 10903(d).  Unlike the court, the STB is not required to consider what is in the best interests of the debtor's estate.  Further, in determining the public interest, the STB must consider whether the abandonment or discontinuance will have a "serious, adverse impact on rural and community development."  Id.  The STB must also adhere to the national transportation policy of promoting competition between rail carriers.  49 U.S.C. § 10101(1),(4).  In applying the public interest standard, the STB weighs the interests of the carrier, the affected shippers, the community, and interstate commerce generally.  Purcell v. United States, 315 U.S. 381, 384 (1942).

[8] The trustee argues it is highly unlikely a court would ever rule contrary to the STB's advisory opinion.  This is ironic, given that the STB has already ruled that the relief the trustee seeks is against the public interest and what the trustee wants is a second bite at the apple in district court.

-18-

rail lines, the bankruptcy court could not grant this abandonment until the debtor first sought an application with the STB to discontinue the overlying trackage rights of a non-debtor. See Mo. Pac. R.R. Co., 9 I.C.C.2d 1228, 1230 (1993) (An "abandonment may not be consummated until [the rail carrier with trackage rights'] discontinuance has been authorized and interested persons are given an opportunity to seek imposition of trail use and public use conditions.").[9]

Finally, the trustee argues that legislative history should not be considered, but that if it is, it supports the trustee's interpretation.[10] We take each argument in turn.

The meaning of the term "abandonment" as it is used in 11 U.S.C. § 1170 is not self-evident and cannot be resolved on textual plain meaning grounds. One cannot tell by reading the term

---

[9] Of course, BAR, pursuant to agreement with MM&A, does not seek the abandonment of the underlying Madawaska line, only the discontinuance of CN's trackage rights over that line and the abandonment of CN's easement. BAR wants to keep the lines and oust CN, so the issue it raises does not apply to its own situation.

In any event, requiring the debtor to apply to the STB for the adverse discontinuance of the trackage rights of a non-debtor will not prevent the bankruptcy court from discontinuing the debtor's rail operations over that line. The bankruptcy court can still discontinue the debtor's own "money-losing operations over the line" in the short term to stem the cash drain that the rail operation is causing the debtor.

[10] The trustee also argues that In re New York, Susquehanna & W. R.R. Co., 160 F.2d 29, 32 (3d Cir. 1946), illuminates the meaning of 11 U.S.C. § 1170. Susquehanna presents a factual scenario similar to the one before us, but the similarities stop there. Susquehanna was decided before the passage of section 1170, and it did not squarely address the question before us today.

-19-

"abandonment" in section 1170 whether the term includes "adverse abandonment." Nor can one tell whether this is so simply from the fact that the term "abandonment" in section 10903 has been construed to include adverse abandonments as well. In determining what the statute means, we cannot simply rely on a few phrases in a complicated statutory structure. Section 1170 must be read in the context of what Congress was trying to do when it gave the bankruptcy court abandonment authority over a debtor railroad in bankruptcy. Both that context and the legislative history lead us to reject the trustee's interpretation.

In designing the statutory scheme, Congress set up an interplay between 11 U.S.C. § 1170 and 49 U.S.C. § 10903. Under section 10903, the STB is the regulatory board charged with implementing overall Congressional rail transportation policy. Rail carriers are subject to the jurisdiction of the STB, and when a rail carrier intends to abandon its underlying rail lines or discontinue rail transportation or trackage rights over a line, it must seek permission by filing an application with the STB. 49 U.S.C. § 10903. Generally, the STB's authority over abandonment of rail lines is exclusive and plenary. Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 321-23 (1981).

One exception to this exclusive STB authority is the abandonment of rail lines when a debtor railroad is in bankruptcy. Congress designed special provisions in those limited circumstances

for railroad reorganization that attempted to allow the railroad to emerge as "a living, not a dying, . . . enterprise." See New Haven Inclusion Cases, 399 U.S. 392, 431 (1970)(internal quotations omitted). One such provision can be found in the 1978 Amendments to the Bankruptcy Code, 11 U.S.C. § 1170.

Section 1170 replaced section 77(o) of the Bankruptcy Act, formerly codified at 11 U.S.C. § 205(o). The courts had construed the former section dealing with railroads in bankruptcy to require an STB determination of whether an abandonment of a debtor's rail line was adverse to the public interest as a prerequisite to abandonment in bankruptcy. E.g., Palmer v. Massachusetts, 308 U.S. 79, 87-88 (1939). Palmer involved a direct abandonment by a debtor rail line of its own lines. In an effort to streamline the process, Congress made it clear in enacting 11 U.S.C. § 1170 that it wanted the bankruptcy court, not the STB, to make the final determination of whether a debtor's rail lines could be abandoned and the STB to play an advisory role, subject to time constraints. This would speed up the decisional process.

Importantly, the STB was not ousted of its exclusive jurisdiction over all matters pertaining to bankrupt railroads. See 11 U.S.C. § 1166 ("Except with respect to abandonment under section 1170 [and certain other situations]. . . the trustee and the debtor are subject to the provisions of subtitle IV of title 49 [the chapter authorizing the STB] that are applicable to railroads

-21-

. . . .).  If, for example, the debtor as part of its reorganization plan wanted to "construct an extension to any of its railroad lines," "construct an additional railroad line," or "provide transportation over . . . an extended or additional railroad line," it would first have to apply to the STB for a certificate authorizing such activity.  See 49 U.S.C. § 10901.[11]

Under section 1170, the STB still plays an important advisory role in the granting of permission for the abandonment of a reorganizing debtor's rail lines.  If the STB issues an advisory report within the time allowed by the bankruptcy court, the bankruptcy court should consider the STB's report, but the STB's conclusions are not binding.  11 U.S.C. § 1170 (b),(c).

The legislative history of section 1170 illuminates Congress's intent in several ways.  First, it identifies the regulatory problem that needed to be remedied.  Second, it identifies the type of problems suffered by debtor railroads which were of concern.  Third, it focuses on which railroads' (debtor or non-debtor) interests were of concern.  Fourth, it emphasizes that other types of issues concerning a debtor's rail line remain within the STB's exclusive jurisdiction.

---

[11] Under 11 U.S.C. § 1166, after the STB grants the debtor the right to go forward with the rail line or service, the bankruptcy court must also approve the plan if these actions require "the expenditure . . . of money from the estate."  11 U.S.C. § 1166 (1).

In enacting section 1170, Congress was attempting to remedy specific problems which arose from the judicial interpretation of the old scheme. The regulatory problem was that when the debtor was first required to go to the STB to seek the abandonment without any time limits for the STB decisions and then go to the court, there was a delay. The Senate Report states:

> The incorporation of railroad reorganizations into the general reorganization provisions of the bill eliminates the cumbersome and duplicative procedure of section 77 under which plans of reorganization shuttled back and forth between the [STB] and the courts and proceedings were inevitably more time consuming and expensive. Under the bill, the bankruptcy court, rather than the [STB], assumes the primary responsibility for the reorganization proceeding.

S. Rep. No. 95-989, at 11-12 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5797-98. In turn, this delay exacerbated the cash drain[12] on a rail carrier operating a financially unsound line while waiting for the STB to consider its application to abandon that line:

> In the case of a railroad being administered under title 11, the necessity to stem the bankrupt carrier's cash drain requires expeditious treatment of abandonment applications. This subchapter provides that the court

---

[12] The trustee says that its earlier three agreements with CN, reached in late March 2001, before the December 2001 bankruptcy, have proven to be bad deals for BAR (now MM&A). The trustee argues that the fees it is paid by CN are not as profitable as BAR would like and so BAR has an interest in forcing CN to abandon its rights. This is also the sort of "cash drain" referred to in the legislative history, he says. However, as Fraser points out, the trustee does not say BAR is losing money from its operation under the haulage agreement. He says only that BAR can make more money if CN had no rights. BAR (now MM&A) essentially would have a monopoly if CN were ousted and it could exercise monopoly pricing.

rather than the [STB] has the authority to authorize abandonments or discontinuances of rail services.

H. Rep. No. 95-595, at 423 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6379. The legislative history makes it clear that Congress was concerned with making the system for the abandonment of debtor railroad's rail lines quicker, more efficient, and less costly for the debtor railroad.

The legislative history emphasizes that many of the operations of the debtor railroad remain within the exclusive jurisdiction of the STB:

> [S]ince a plan of reorganization for a railroad may propose changes in transportation patterns or operation by, among other things, granting operating rights over, or transferring, the debtor's rail lines, the bill retains the [STB's] jurisdiction with respect to such proposals. The subchapter requires that such proposals be referred to the [STB] for its approval, disapproval, or modification and requires the reorganization court to give binding effect to the [STB's] findings on such aspects of a plan.

S. Rep. No. 95-989, at 11 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5797 (emphasis added). In referring to the powers that are exclusively retained by the STB, the legislative history says, "the debtor's rail lines," evidence that Congress's concern was for the debtor's own lines,[13] not those of a financially sound railroad.

---

[13] The parties have essentially framed the issue as if BAR continued to own the line and have not suggested that the sale of the line to MM&A moots the matter. As the sale of the line was part of the reorganization plan, this treatment is a reasonable position and we do not look behind it.

Against this backdrop, there is little reason to think Congress intended, by using the word "abandonment" in section 1170 to include "adverse abandonment" by a debtor railroad, to oust a third party from rights in the debtor's own lines, and thus silently strip the STB of its exclusive jurisdiction over the abandonment of a non-debtor's lines or trackage rights.[14]

In addition to being at odds with the expressed intent of Congress, the trustee's interpretation would create a new set of problems. Included among those problems is the creation of financial incentives for bankrupt railroads to attempt to disrupt the operation of other healthy railroads. This is against public policy. Congress surely did not intend to create a bounty system, as here, that allows debtors in bankruptcy to sell their lines to a non-debtor and then use bankruptcy courts, not the STB, to eliminate competition between other non-debtor rail carriers.

Finally, to the extent the STB has spoken on this issue, we give some[15] weight to what it has said. In an advisory opinion

_____

[14] In the alternative, the trustee, in his reply brief and at oral argument, argued a narrower interpretation of the statute. The trustee's interpretation would limit the bankruptcy court's reach, but still allow this court to grant the relief that the trustee seeks. He proposes allowing the bankruptcy court authority over abandonments of a non-debtor's rail lines and trackage rights in situations in which the debtor has a property or contract interest in the non-debtor's lines or trackage rights. Significantly, the interpretation resolves none of the problems discussed in this opinion, and we reject it.

[15] We emphasize the word "some." The agency issued its interpretation as an advisory opinion to the bankruptcy court

to the bankruptcy court, <u>Chicago, Rock Island & Pac. R.R. Co.</u>, 363 I.C.C. 150, 171 (1980), the STB stated that the bankruptcy court cannot abandon or discontinue lines jointly owned by debtor and a financially healthy company.  The STB noted that the only way for these lines to be abandoned is through an application to the STB, pursuant to 49 U.S.C. § 10903.  This holding obviously is consistent with our disposition here.

It follows not only that the bankruptcy court had no power to approve the adverse abandonment and discontinuance sought by the trustee here, but also that the STB had power to issue a binding final order in this case.  No attack on the merits of the STB's decision having been made by the trustee, such an attack has been waived.  We **affirm** the district court's dismissal of Count III of the trustee's complaint for failure to state a claim upon which relief can be granted.  We **affirm** the STB's final order denying the trustee's application to adversely discontinue and abandon the trackage rights and easement of CN.  So ordered.  Costs are awarded to CN and Fraser.

---

pursuant to 11 U.S.C. § 1170(b).  An advisory opinion, as opposed to the final order issued under section 10903, does not have the force of law and indeed is not binding on the bankruptcy court. <u>See</u> <u>Christensen</u> v. <u>Harris County</u>, 529 U.S. 576 (2000).